**Steve HARPER, Plaintiff,**

v.

**James C. CROCKETT, Individually and as Official Capacity as Chief of Police for the City of Sherwood, Arkansas, Defendant.**

**No. LR–C–93–549.**

United States District Court,
E.D. Arkansas,
Little Rock Division.

Oct. 26, 1994.

Robert Newcomb, Little Rock, AR, for plaintiff.

David Fuqua, Little Rock, AR, for defendant.

Wilson, District Judge.

### ORDER

Defendant, James C. Crockett, has filed a motion for summary judgment. Plaintiff alleges violations of his constitutional rights. Defendant denies the allegations, contending that plaintiff's rights were not violated, and

that the police department regulations at issue were not unconstitutionally overbroad or vague. Defendant's motion will be granted, for the reasons stated below.

## SYLLABUS

I. BACKGROUND .................................................. 1563
II. SUMMARY JUDGMENT ........................................ 1564
III. FIRST AMENDMENT ANALYSIS OF <u>CONNICK v. MYERS</u> AND <u>WATERS v. CHURCHILL</u> ......................................... 1564
IV. "BALANCING" ANALYSIS UNDER <u>PICKERING</u> ..................... 1572
V. OVERBREADTH ............................................... 1574
VI. VAGUENESS ................................................. 1580
VII. JUDGMENT ................................................. 1584

## BACKGROUND

Plaintiff, Steve Harper, is a patrolman for the City of Sherwood, Arkansas. On March 2, 1993, while off duty and not in uniform, Mr. Harper went to a branch of Eagle Bank on Warden Road in Sherwood to cash his federal income tax refund check. Plaintiff became upset when the bank employees informed him that he would have to pay 10% of the refund check amount as a service charge for the bank cashing the check, since he did not have an account with Eagle Bank. After arguing with employees at the Warden Road branch, plaintiff then drove to the Eagle Bank branch on Kiehl Avenue, where the employees knew him. Mr. Harper was again told that the bank would charge a ten percent fee because he did not have an account with the bank. Plaintiff again became upset, and as he was leaving he addressed a customer, Mary Bradshaw, with a statement to the effect that "Just wait until the next time they're getting robbed and I'm the first one in getting shot at. That's my job you know, I am a policeman." An employee at the bank also heard this remark. The bank complained to the Sherwood Police Department. Defendant, Chief of Police James C. Crockett, asked Sgt. Mitch Milligan to conduct an internal investigation. Milligan first conducted an oral interview with Harper, and then asked him to provide a written account of the incident. The plaintiff wrote "I do not recall" on the report. In his deposition, plaintiff acknowledged all of the facts stated above, except that he stated he does not recall having made the statement to Ms. Bradshaw. As a result of the incident at the bank, Crockett suspended Harper for 30 days without pay. Jurisdiction is invoked pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 1983.

Plaintiff contends that the suspension violated his First Amendment right of free speech, and prays for damages for the alleged violation. Further, plaintiff requests a declaratory judgment that one of the regulations (Rule 4.06.17) of the Sherwood Police Department is unconstitutionally vague or overbroad. Rule 4.06.17 provides that "Employees shall conduct themselves at all times both on duty and off, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department, or that which impairs operation or efficiency of the Department or employee." He contends that he was arbitrarily and capriciously deprived of his pay during the 30–day suspension by two other rules (Rule 4.06.13 and Rule 4.06.33) of the Department regarding untruthfulness by an officer. The latter rules state that

> Upon order of the Office of the Chief of Police, or the Chief's designee, as a Superior Officer conducting an administrative or criminal investigation, employees will truthfully answer all questions specifically directed to them regarding the investigation.

> An employee shall give truthful statements at all times regarding the scope of employment and operations of the Depart-

ment. A statement should not be made unless the employee is sure of its truthfulness.

## SUMMARY JUDGMENT

Summary judgment is appropriate only when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart,* 813 F.2d 874 (8th Cir.1987); Fed. R.Civ.P. 56. The Supreme Court has established guidelines to assist trial courts in determining whether this standard has been met:

> The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 [106 S.Ct. 2505, 91 L.Ed.2d 202] (1986).

The Eighth Circuit has set out the burdens of the parties in connection with a summary judgment motion in *Counts v. M.K. Ferguson Co.,* 862 F.2d 1338 (8th Cir.1988):

> The burden on the party moving for summary judgment is only to demonstrate, i.e., 'to point out to the District Court,' that the record does not disclose a genuine dispute on a material fact. It is enough for the movant to bring up the fact that the record does not contain such an issue and to identify that part of the record which bears out his assertion. Once this is done, his burden is discharged, and if the record in fact bears out the claim that no genuine dispute exists on any material fact, it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue. If the respondent fails to carry that burden, summary judgment should be granted. *Id.* at 1339 (quoting *City of Mt. Pleasant v. Associated Elec. Coop.,* 838 F.2d 268, 273–274 (8th Cir.1988)).

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Supreme Court has emphasized that Rule 56 must be construed with due regard not only for the rights of people asserting claims and defenses "that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the rule, prior to trial, that the claims and defenses have no factual basis." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## FIRST AMENDMENT ANALYSIS OF *CONNICK v. MYERS* and *WATERS v. CHURCHILL*

 Whether a public employee's speech is protected by the First Amendment requires a two-step judicial inquiry. *Shands v. City of Kennett,* 993 F.2d 1337, 1342 (8th Cir.1993). The threshold issue is whether the employee's speech can be "fairly characterized as constituting speech on a matter of public concern." *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If the speech addresses a matter of public concern, then the Court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern, and the interests of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Grantham v. Trickey,* 21 F.3d 289, 292 (8th Cir.1994). If the speech is not a matter of public concern, the Court does not reach the second, "balancing" step of the inquiry. *Bausworth v. Hazelwood School District,* 986 F.2d 1197 (8th Cir.1993); *Potter v. Arkansas Game & Fish Commission,* 839 F.Supp. 638, 639 (E.D., Arkansas 1993).

 The inquiry into the protected status of the speech is a question of law, *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. at 1690 n. 7, and thus is readily susceptible to summary judgment disposition. *Pearson v. Macon–Bibb County Hospital Auth.,* 952 F.2d 1274

(11th Cir.1992); *Bausworth,* supra, at 1198. To establish that a public employee's speech is protected by the First Amendment, the employee must make a threshold showing that the speech addressed a matter of public concern, that is, a matter of "political, social or other concern to the community." *Connick,* supra, 461 U.S. at 143, 146, 103 S.Ct. at 1688, 1690. In determining whether the speech dealt with a matter of public concern, the focus is on the "content, form, and context of a given statement, as determined by the whole record." *Connick,* at 147–148, 103 S.Ct. at 1690. The Supreme Court has emphasized that "absent highly unusual circumstances, a federal court is not the appropriate forum for reviewing a public employer's reaction to an employee's speech when the employee did not speak as a citizen on a matter of public concern." *Id.* at 147, 103 S.Ct. at 1690.

■ Plaintiff contends that there are factual issues regarding what exactly Mr. Harper said at the bank. The Supreme Court recently addressed this general issue in the major First Amendment decision of *Waters v. Churchill,* —— U.S. ——, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994). The *Waters* Court ruled that "The *Connick* test should be applied to what the government *employer* reasonably thought was said, not to what the trier of fact ultimately determines to have been said." (emphasis supplied) *Id.,* at —— ——, 114 S.Ct. at 1880–1881. In *Waters,* the Court stated that it was "agreed that it is the court's task to apply the *Connick* test to the facts." *Id.* at ——, 114 S.Ct. at 1884. The Court concludes, for the reasons discussed below, that Chief Crockett "reasonably" concluded that Mr. Harper made the "alarm" statement in the context of his personal bickering directed against the bank. Having reached this conclusion, the Court further finds that this speech was not a matter of public concern under *Connick.*

At oral argument in this case, both parties expressed uncertainty as to the meaning of the Supreme Court's decision in *Waters,* in which there were four separate opinions. In *Waters,* there was a dispute about what the plaintiff had actually said in a conversation in which she had criticized the operation of the obstetrics department at a hospital where she was employed as a nurse. *Id.* at ——, 114 S.Ct. at 1882. Plaintiff, Ms. Churchill, contended that she had criticized certain substantive training policies of the hospital, whereas her supervisor, Ms. Waters, contended that other employees who had overheard Ms. Churchill's conversation indicated that the plaintiff had made sharp personal criticisms of Waters. The Supreme Court reversed part of the decision of the Seventh Circuit, which had ruled that Churchill's speech was a matter of public concern and was not disruptive, and that the inquiry must turn on what her speech actually was, as determined by a jury, not on what the employer thought it was. *Churchill v. Waters,* 977 F.2d 1114 (7th Cir.1992); *Waters,* —— U.S. at ——, 114 S.Ct. at 1880. In announcing the judgment for the Court, Justice O'Connor's plurality opinion observed that the dispute centered on how the factual basis for applying the *Connick* test—"what the speech is, in what tone it was delivered, what the listener's reactions were—is to be determined. Should the court apply the *Connick* test to the speech as the government employer found it to be, or should it ask the jury to determine the facts for itself?" *Waters,* at ——, 114 S.Ct. at 1884. The Seventh Circuit's approach (which the Supreme Court rejected) held that the employer's factual conclusions were irrelevant, and that the jury should engage in its own factfinding. The petitioners in *Waters* argued that the employer's factual conclusions should be dispositive. Justice O'Connor observed that a "middle course" would mean that the court should "accept the employer's factual conclusions, but only if those conclusions were arrived at reasonably." *Id.* The plurality emphasized that First Amendment standards must be applied through "reliable procedures," and reiterated a "basic First Amendment principle: Government action based on protected speech may under some circumstances violate the First Amendment even if the government actor honestly believes the speech is unprotected." O'Connor stated that the Court did not believe that the *Connick* test must be applied only to the facts as the employer thought them to be, without considering the "reasonableness" of the employer's

conclusions. The plurality's "reasonableness" test is flexible and the definition of "reliable procedures" will be delineated on a case-by-case basis in the future. *Id.* In announcing the test in *Waters,* the plurality stated that the employers must make the decision in good faith, but they will have substantial discretion in deciding what constitutes a reasonable investigation:

[the decision must be in good faith] but it does not follow that good faith is sufficient ... We think employer decisionmaking will not be unduly burdened by having courts look to the facts as the employer reasonably found them to be. It may be unreasonable, for example, for the employer to come to a conclusion based on no evidence at all. Likewise, it may be unreasonable for an employer to act based on extremely weak evidence when strong evidence is clearly available—if, for instance, an employee is accused of writing an improper letter to the editor, and instead of just reading the letter, the employer decides what it said based on unreliable hearsay ...

Of course, there will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done, or how much evidence is needed to come to a particular conclusion. In those situations, many different courses of action will necessarily be reasonable. Only procedures outside the range of what a reasonable manager would use may be condemned as unreasonable. *Id.* at ——, 114 S.Ct. at 1889.

Although the *Waters* Court split into four opinions, Justice Souter's concurring opinion clarifies the decision's meaning in pointing out that "Though Justice O'Connor's opinion speaks for just four Members of the Court, the reasonableness test it sets out is clearly the one that lower courts should apply." *Id.,* at ——, 114 S.Ct. at 1893, (Souter, J., concurring). A majority of the Court agreed that employers whose conduct survives the plural-

ity's reasonableness test cannot be held constitutionally liable (assuming the absence of pretext), and a different majority agreed that employers whose conduct fails the plurality's reasonableness test violated the Free Speech Clause. *Id.* Justice Scalia's concurrence (joined by Justices Thomas and Kennedy) flayed the plurality for going too far in creating "a broad new First Amendment procedural right" requiring the employer to conduct an investigation before taking disciplinary action against an employee. *Id.* at ——, 114 S.Ct. at 1893. Scalia contended that the new procedural right would be unpredictable in scope, would expand First Amendment procedures into "brand new areas," and would subject public employers to "intolerable legal uncertainty." *Id.* at —— — ——, 114 S.Ct. at 1893–1896. At the other end of the spectrum, Justice Stevens (joined by Justice Blackmun in one of his last opinions) dissented from the judgment, but agreed with the plurality that "Justice O'Connor appropriately rejects Justice Scalia's position, at least for those instances in which the employer unreasonably believes an incorrect report concerning speech that was in fact protected and disciplines an employee based upon that misunderstanding. I, of course, agree with Justice O'Connor that discipline in such circumstances violates the First Amendment."[1] Justice Souter concluded that since Stevens and Blackmun agreed with the O'Connor plurality that an employer's unreasonable belief based on an incorrect report cannot serve as a proper basis for disciplining an employee, the "plurality opinion may be taken to state the holding of the Court." *Id.* at ——, 114 S.Ct. at 1893.

The plurality observed that "If an employment action is based on what an employee supposedly said, and a reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care." *Id.* The level of care does not have to be equal to the eviden-

---

1. Stevens' difference with the plurality focused on his much greater confidence in allowing juries to decide these issues: "The risk that a jury may ultimately view the facts differently from even a conscientious employer, is not, as the plurality would have it, a needless fetter on public employers' ability to discharge their duties." *Id.,* at ——, 114 S.Ct. at 1900 (Stevens, J., dissenting).

tiary and procedural rules followed in a trial. O'Connor stated that the problem with the Seventh Circuit's approach "is that it would force the government employer to come to its factual conclusions through procedures that substantially mirror the evidentiary rules used in court ... If she relies on hearsay, or on what she knows about the accused employee's character, she must be aware that this evidence might not be usable in court. If she knows that one party is, in her personal experience, more credible than another, she must realize that the jury will not share that personal experience." *Id.* The Court observed that employers often do rely on past similar conduct, hearsay, on personal knowledge of people's credibility, and on other factors that the judicial process ignores: "Such reliance may sometimes be the most effective way for the employer to avoid future recurrences of improper and disruptive conduct. What works best in a judicial proceeding may not be appropriate in the employment context ... A manager may legitimately want to discipline an employee based on complaints by patrons that the employee has been rude, even though these complaints are hearsay." *Id.* at ——, 114 S.Ct. at 1888.

The *Waters* plurality stressed that government employees may have a strong, legitimate interest in speaking out on public matters, and "government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions." *Id.,* at ——, 114 S.Ct. at 1887, citing *Pickering,* supra, 391 U.S. at 572, 88 S.Ct. at 1736. In a case where an employee spoke on a public matter, "in many such situations the government may have to make a substantial showing that the speech is, in fact, likely to be disruptive before it may be punished." *Waters,* citing *Connick,* 461 U.S. at 152, 103 S.Ct. at 1693 and *Pickering,* 391 U.S. at 569–571, 88 S.Ct. at 1735–1736. Although it is thus essential to preserve the rights of public employees who are acting as "whistle-blowers" or other similar roles in contributing informed opinions on public matters, Justice O'Connor stressed that the government in its role as employer "has a freer hand in regulating the speech of its employers than it has in regulating the speech of the public at large." The Court then summarized the rationale behind the government's greater authority as employer than as sovereign:

The key to First Amendment analysis of government employment decisions, then is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer. The government cannot restrict the speech of the public at large just in the name of efficiency. But where the government is employing someone for the very purpose of effectively achieving its goals, such restrictions may well be appropriate. *Id.* —— U.S. at ——, 114 S.Ct. at 1888.

In the instant case, the argument that ultimately led to the suspension had nothing to do with any role of "whistle-blowing" or otherwise exposing the "ailments" (*Pickering,* 391 U.S. at 572, 88 S.Ct. at 1736) of the department for which Mr. Harper worked, or any other public matter—it fundamentally concerned plaintiff's personal frustration and inconvenience regarding the check that he had wished to cash. Mr. Crockett followed reasonable procedures in investigating the incident at the bank branches. Indeed, Crockett's behavior easily passes the requirements stated in *Waters;* when a "reasonable supervisor would recognize that there is a substantial likelihood that what was actually said was protected, the manager must tread with a certain amount of care." *Id.* at ——, 114 S.Ct. at 1889. In this case, the reports of a personal quarrel in public, of threatening to perform in an untimely manner in carrying out his professional duties were statements that did not have a "substantial likelihood" of being protected speech, and as a matter of law this Court today rules that they were not on "a matter of public concern."

Crockett followed careful procedures in investigating the incident. Harper does not deny having made the "alarm" statement; instead, he says he does not recall it. Ms. Bradshaw, the customer to whom Harper made the remark, said that Harper made a statement to the effect that "Just wait until the next time they're getting robbed and I'm

the first one in getting shot at. That's my job you know, I am a policeman." Ms. Bradshaw indicated in a statement that was part of the Sherwood Police Department's internal report that Harper was "indicating that he would not be so quick to do his job and felt it was a threat to the tellers in the bank." Another bank employee also heard the statement, as noted above. Several employees at both branches of the bank made written statements to the Sherwood Police regarding their direct observation of plaintiff's personal anger over the fee policy. A thorough investigation of the incident was conducted, including a review of written and oral statements from bank employees and customers who were all the known witnesses. Mr. Harper was given both written and oral interview opportunities to present his side of the story. After reading a transcribed statement from the plaintiff in his interview with the internal police investigator, and reviewing a statement by an investigator detailing the demeanor of the plaintiff during the police investigation, Chief Crockett then reasonably concluded that Harper had made a statement that because of his personal ire at the bank, he might respond more slowly to a robbery alarm than he would have had he not become involved in the argument with the bank employees.

In *Waters,* the supervisors conducted an investigation into what was actually said in the conversation that ultimately led to Churchill's firing, and management relied on "the word of two trusted employees," the endorsement of those employees' reliability by three hospital managers, and a meeting with the employee. "Management can only spend so much of their time on any one employment decision," Justice O'Connor wrote, and after the managers had conducted the investigation based on the mentioned facts, the Court ruled that the managers had been reasonable. *Id.*

The facts in *Waters* differed somewhat from those in the instant case, because the Supreme Court concluded that the plaintiff, Ms. Churchill, had produced sufficient evidence to create a material issue of disputed fact about petitioners' actual motivation. *Id.* at ——, 114 S.Ct. at 1890. Ms. Churchill had

previously engaged in a substantial amount of criticism of the hospital's substantive training policies in the past, and there was a doubt as to whether Ms. Waters' motivation in firing her was pretextual and actually based on these prior nondisruptive, substantive comments about training policy, and "not because of the disruptive things she said." The Court did not decide the "public concern" issue: "Even if Churchill's criticism of cross-training ... was speech on a matter of public concern—something we need not decide—the potential disruptiveness of the speech as reported was enough to outweigh whatever First Amendment value it might have had ... Discouraging people from coming to work for a department certainly qualifies as disruption." *Id.* at ——, 114 S.Ct. at 1890. There is no issue regarding pretext in this case. There is no evidence that Chief Crockett suspended Harper for pretextual reasons; there is no dispute that the rude and angry manner in which Harper conducted himself in his arguments at the bank, the "alarm" statement, and plaintiff's conduct in the internal investigation were the reasons for the disciplinary action. Since this Court is not the appropriate forum for reviewing Crockett's reaction to an employee's speech that did not cover a matter of public concern, *Connick,* 461 U.S. at 147, 103 S.Ct. at 1690, the Court does not take any position as to whether the discipline of a 30–day suspension was lenient or severe. Again, that is not a matter for the Court to address.

It is noted that the fact pattern of this case differs from the typical *Connick/Pickering* pattern, because much of the speech and conduct involved was off the job and at least in the beginning was not focused on police activities, although the "robbery alarm" statement referred to police duties. The usual *Connick/Pickering* case involves an employee who has been fired or suspended by a public employer for critical and allegedly disruptive comments made about work at the office. *Flanagan v. Munger,* 890 F.2d 1557 (10th Cir.1989). However, the plaintiff's conduct and speech during the investigation was fully in a work setting, and his "robbery alarm" statement was directly related to his work. The public concern test may be somewhat more difficult to apply to

cases such as this one that do not fit the classic *Connick* pattern. *Flanagan,* at 1562.[2]

■ In applying the *Connick* "public concern" analysis to the case at bar, it is clear that Mr. Harper's speech focused on a personal quarrel and was not a matter of public concern. Plaintiff acknowledged in his deposition that he was speaking as a private citizen. His speech did not deal with any public policies of the Sherwood Police Department or the City of Sherwood; in fact, its only relevance to the Police Department came in the implied threat of nonperformance of duty in the event of a future robbery alarm. Plaintiff's speech centered upon his anger over not getting his check cashed, unless he agreed to the fee that the bank charged to people who did not have an account with the bank. His suspension had nothing to do with the substance of his position on banking policy—indeed, there is no evidence that the defendant in any way disagreed with Mr. Harper regarding the Eagle Bank's policy, and in fact Mr. Crockett may have agreed that the policy was annoying or inconvenient. The problem was Harper's hotheaded reactions to the fee policy and his use of a veiled threat with respect to his future performance as a police officer. Crockett's decision to suspend Mr. Harper was based upon his conclusion that plaintiff had made an angry statement to a member of the public to the effect that he, as a police officer, "would be less than timely in responding to a [robbery alarm] at the bank." A customer as well as a bank employee overheard this remark. (Notice of Suspension, James Crockett, Chief of Police, Sherwood Police Department, to Officer Steve Harper, April 15, 1993). Further, Crockett's second stated reason for the suspension was that

Harper violated the regulation regarding truthfulness "on March 10, 1993, after having received a direct order from Sergeant Milligan, acting as my designee in the course of an administrative investigation, to write a complete statement regarding the above referenced incident [at the Eagle Bank] you wrote 'I do not recall' on a sheet of paper and refused to give any further written statement." (Notice of Suspension, James Crockett, Chief of Police, Sherwood Police Department, to Officer Steve Harper, April 15, 1993).

■ In his complaint, plaintiff contends that he had a right to express himself regarding banking policy, and that "the United States Congress presently has pending a bill to prohibit United States Banks from charging check cashing fees for government tax refund checks, thereby making any statement concerning this matter a matter of public concern." As stated above, Harper was not suspended because of any statement about banking policy, but because of his remark about future robbery alarms and his failure to follow the departmental rule requiring that all employees "truthfully answer all questions specifically directed to them regarding the investigation." (Rule 4.06.13). Moreover, plaintiff makes a clearly erroneous argument in contending that the fact of a pending bill in Congress regarding banking policy renders Harper's statement "of public concern." First, plaintiff conceded in his deposition that he did not even know about the pending legislation at the time he made the statements about the Eagle Bank's policy. (Harper deposition at 23). Obviously, plaintiff was not engaging in a public policy debate concerning the banking legislation

---

**2.** The Supreme Court extended the *Connick/Pickering* analysis to a case that does not fully replicate the original *Connick/Pickering* fact situation in *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). In that case a local official fired an employee who referred to the attempted assassination of President Reagan and said to another employee, "if they go for him again, I hope they get him." The Third Circuit concluded that this extension does not mean that the public concern test should be extended two steps further to include a case in which a public employee (1) engages in nonverbal protected expression which is (2) neither at work nor about

work. *Flanagan,* supra, at 1562. In *Flanagan,* officers were disciplined for having been part owners of a store that sold sexually explicit videos, and the Third Circuit found it exceedingly difficult to apply the public concern test to the facts of that case. However, the Court concluded that the second, "balancing" prong of the judicial inquiry would still be easy to apply even in the atypical fact pattern. The case at bar differs from the *Flanagan* fact situation, because Harper was speaking away from work at the bank (although not in the later investigation) but his "alarm" statement was related to work.

when he became involved in the personal quarrel over his check at the bank. Mr. Harper incidentally made remarks about a subject that Congress was considering, but his intent was to express his personal frustration in an effort to pressure the bank employees into making an exception to the rule and allow him to cash his check without paying the fee.

More importantly, even if Mr. Harper had been aware of the pending legislation, that would not transform his speech into a matter of public concern; as the Supreme Court stated in *Connick*, expression that is "not otherwise of public concern does not attain that status because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." *Connick*, 461 U.S. at 148 n. 8, 103 S.Ct. at 1690 n. 8. As the Court expressed it in *Terrell v. University of Texas System Police*, 792 F.2d 1360, 1362 (5th Cir.1986), in deciding whether speech was of public concern, "we do not focus on the inherent interest or importance of the matters discussed by the employee." In making this determination, "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Id.* Similarly, the Eighth Circuit has stressed that "we focus on the employee's role in conveying the speech rather than the public's interest in the speech's topic." *Bausworth*, supra, at 1198; citing *Terrell*. In examining the employee's role, courts consider whether the employee attempted to communicate the speech to the general public and the employee's motivation in speaking. *Deremo v. Watkins*, 939 F.2d 908, 910–911 (11th Cir.1991). Mr. Harper made no effort to contact the media or communicate to the public at large concerning his concerns regarding the Eagle Bank's check cashing policies. Although he made the statement in a public setting at the bank, only the few people who were in the bank at the time heard it, and his motivation in speaking was personal frustration; it was obviously not any attempt to communicate with the public in general. Mr. Harper's case provides a stark contrast to the public employee in *Pickering*, where the Supreme

Court ruled that a high school teacher who published a newspaper article criticizing the allocation of school funding "and the superintendent's methods of informing, or preventing the informing of, the school district's taxpayers of the real reasons why additional tax revenues were being sought for the schools ... [addressed] a matter of legitimate public concern [upon which] free and open debate is vital to informed decision-making by the electorate." *Pickering*, 391 U.S. at 571–572, 88 S.Ct. at 1736. In focusing upon the "context" of Harper's speech under the *Connick* analysis, the only occasion upon which plaintiff made his criticisms regarding Eagle Bank's policies took place in the context of a personal quarrel. The failure to make any effort to communicate his views to the general public helps demonstrate that he was speaking only to vent his personal anger over not being able to cash his check, and not any effort to generate real debate on banking policy.

Pursuant to the *Connick* analysis, the "content" of Harper's speech consisted of criticisms of the bank employees for requiring a 10% fee for people who were not customers of Eagle Bank, the statement about the robbery alarm, and the refusal to give a written account of the incident. This content focused on personal frustration, and this court is not the proper forum to review Chief Crockett's reaction to speech that was clearly not uttered as a citizen speaking out on a matter of public concern. *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690. Any citizen certainly has a right to express himself regarding banking policy, but the content of the speech that led to the suspension had no real connection with substantive banking policy—it had to do with the officer's statement in the context of a personal argument with the bank employees about his professional activities in the event of a robbery alarm, and the Police Chief's conclusion that he had violated departmental policy regarding truthfulness in internal investigations.

Plaintiff makes the hypothetical argument that he had asked Crockett at deposition whether it would violate the department rule "if a white police officer dressed up in black

face as Al Jolson to appear in a night club." When the Chief stated that such an appearance would violate the Sherwood rule, plaintiff alleges that "he clearly indicated that it would impinge upon the First Amendment rights of an officer since the identical issue was addressed by the Fourth Circuit Court of Appeal in *Berger v. Battaglia,* 779 F.2d 992 (4th Cir.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 720 (1986)." *Berger* is distinguished from Harper's case, because Officer Berger's entertainment speech in appearing in night clubs as an "Al Jolson character" while off duty was on a matter of public concern. After complaints from the members of Baltimore's black community that the show was offensive, the department ordered him to cease public appearances in blackface. *Berger,* at 996. Unlike Harper, who called attention to the fact that he was a policeman and explicitly referred to his future role in responding to a robbery alarm, Berger never identified himself as a policeman in any of his performances and never referred to any of his activities as a policeman. *Id.* at 993. The *Berger* Court pointed out that plaintiff's off-duty performances had "to be accorded the same weight in absolute terms that would be accorded comparable artistic expression by citizens who do not work for the state. And that value, traditionally, has been accorded a great deal of weight, certainly not far below the value accorded political and social commentary and debate. *See, e.g., Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975)." *Berger,* at 999. In contrast, Harper's speech and conduct has no political, social or artistic significance.

The question whether the speaker attempted to communicate with the general public is an important factor in the judicial analysis, although it is not dispositive by itself; in *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979), the Supreme Court ruled that expression that is communicated privately can still be a matter of public concern. Since plaintiff's remarks were made in public at two branches of a bank, it would not appear logical to regard them as

having been made in a "private forum." But even if Harper's statements to the few people who happened to be in the bank at the time of the incident are construed as having been conveyed in a "private forum," it is clear that the content of his speech differs markedly from that of Mrs. Givhan, who without doubt communicated her views privately; as the Court stressed in *Givhan,* "Mrs. Givhan's right to protest racial discrimination—a matter inherently of public concern—is not forfeited by her choice of a private forum." *Givhan,* supra, at 415–416, 99 S.Ct. at 696–697. *Givhan* is also clearly distinguishable from *Harper* because rather than speaking in the context of a personal quarrel, Givhan was objecting to allegedly racially discriminatory policies of the School District. *Connick,* 461 U.S. at 146, 148 n. 8, 103 S.Ct. at 1689–1690, 1690 n. 8, citing *Givhan,* 439 U.S. at 415–416, 99 S.Ct. at 696–697.

The facts of this case differ from *Givhan* and some of the other cases in the sense that the dispute began not as an employee's criticism of his employer's policies, but as the employee's criticism of a third party's fee policy. The issue in the case, however, ultimately comes down to plaintiff's "alarm" statement and his later objections to his employer's rules and regulations as applied in his suspension. Plaintiff correctly contends that defendant was acting under color of state law when he suspended Mr. Harper. Under 42 U.S.C. § 1983, "Every person who under color of any statute, ordinance, or regulation ... of any state ... subjects or causes to be subjected, any citizen of the United States ... to deprivation of any rights, privileges or immunities secured by the Constitution ... shall be liable to the party injured." Defendant contends that the fee policy of the bank was the policy of a private entity and not that of the City of Sherwood. (Answer, at 2). On this point, defendant's comment is not relevant to the issue of whether the speech was a matter of public concern. It is obvious that the state action was the suspension, not the bank's fee policy. Thus, it is clear that the "under color of state law" requirement was met. This question, however, is relevant only to the issue of whether this Court has jurisdiction

under 42 U.S.C. § 1983. The Court obviously has jurisdiction under 42 U.S.C. § 1983, but that is not relevant to whether the speech involved was a matter of public concern. For the reasons discussed above, the speech essentially consisted of personal bickering and was not a matter of public concern.

The Court concludes that the speech was not a matter of public concern, and thus the inquiry stops at this point because plaintiff failed to meet the threshold "public concern" test.

### "BALANCING" ANALYSIS UNDER *PICKERING*

■ Although this Court has decided in the case at bar that Mr. Harper's speech was not on a matter of public concern, even if the Court were to assume, *arguendo*, that Harper had spoken on a public matter, it is also clear that his speech would fail the *Pickering* "balancing" test, for plaintiff's conduct and speech clearly were highly disruptive to the employer's interest in "promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 563, 88 S.Ct. at 1731. It is disruptive to the Police Department to have an officer violate departmental regulations by refusing to give a full written account of an incident when asked to do so as part of an official investigation. The employees and customers who witnessed the incidents said the officer acted in an offensive, hotheaded manner; such conduct—especially the "alarm" statement—obviously can undermine public confidence in the police department. One customer who witnessed the argument wrote in her statement to the police department that Harper "got angry and mouthed off to the teller in a rude manner. He didn't have an account there and there are signs explaining that they don't cash checks, especially government checks, if you don't have an account with Eagle Bank. I don't feel he acted in a fashion a police officer should." (March 3, 1993 statement of Barbara Rodgers). Another citizen who saw the incident wrote, "I felt his comment [about the alarm] was inappropriate and he is the type of individual that gives the police force a bad name." (March 11, 1993 statement of Mary Bradshaw). At

the oral interview between Harper and Sgt. Milligan, who was conducting the investigation for the department, Milligan asked plaintiff three times to make a written statement; Milligan finally stated that "The tape [of the interview] will be transcribed and I also want you to give me a written statement of what took place." (March 10, 1993 transcript of interview with Sgt. Milligan and Officer Harper).

In a case applying the *Pickering* balancing test, the Eighth Circuit ruled that "As a public safety organization, a fire department, like a police department, has a more significant interest than the typical government employer in regulating the speech activities of its employees in order 'to promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence' in its ability." *Shands v. City of Kennett*, 993 F.2d 1337, 1334 (8th Cir.1993). Harper's speech was obviously of the kind that would undermine the goal of "instilling public confidence" in the Police Department's ability to perform its service.

■ The *Pickering* test balances the employee's interest in commenting on matters of public concern and the government interest in "effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150, 103 S.Ct. at 1692. In striking this balance, courts weigh six interrelated factors:

1) the need for harmony in the office or work place;

2) whether the government's responsibilities require a close working relationship to exist between the plaintiff and co-workers when the speech in question has caused or could cause the relationship to deteriorate;

3) the time, manner, and place of the speech;

4) the context in which the dispute arose;

5) the degree of public interest in the speech; and

6) whether the speech impeded the employee's ability to perform his or her duties.

*Shands*, at 1344; *Bowman v. Pulaski County Special School District*, 723 F.2d

640, 644 (8th Cir.1983) (citing *Connick,* 461 U.S. at 151–154, 103 S.Ct. at 1692–1694). The *Pickering* balance is flexible, and the weight attributed to any one factor varies depending upon the particular circumstances of each case. *Germann v. City of Kansas City,* 776 F.2d 761, 764 (8th Cir.1985). Resolution of the *Pickering* balance is a question of law. *Brockell v. Norton,* 732 F.2d 664, 667 (8th Cir.1984). Courts must accord to the government the wide degree of discretion necessary for the proper management of internal affairs and personnel actions. *Connick,* 461 U.S. at 151, 103 S.Ct. at 1692, citing *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15 (1974).

▇▇▇▇ Regarding the need for harmony in the work place, evidence of actual disruption in the department is not required, *Shands,* at 1344; *Germann,* at 765, but the undermining of public confidence and the tensions evident at the oral interview, as well as general disruptive effect of plaintiff's "alarm" statement upon other officers, would obviously tend to foment disharmony within the department. The level of disruption a public employer must tolerate depends on several factors in the *Pickering* calculus: the extent to which the speech addresses a matter of public concern, the type of service the employer provides, and the context of the speech. *Connick,* 461 U.S. at 152, 103 S.Ct. at 1693; *Germann,* at 765. The Court has already stated its ruling that there was no "matter of public concern" involved here—the "extent" referred to by the Eighth Circuit dealt with a situation where most of the speech was not on a public matter but some of the speech did touch upon public matters, at least to a minimal extent. Even if this Court were to assume—strictly for the sake of argument—that any of Harper's speech marginally touched upon a matter of public concern, it would nonetheless decide that given the type of "life-and-death" services that a police department is frequently called upon to provide, and the context of the speech as a personal quarrel, the speech tended to promote disharmony in the work place. The Eighth Circuit has held that firemen or policemen "must follow their superiors' orders and work together harmoniously to ensure their own and the public's safety," and hence

their personnel decisions are entitled to "considerable judicial deference." *Shands,* at 1345. If the speech has caused "or could cause the relationship to deteriorate," this factor will weigh in favor of the conclusion that the speech was disruptive. *Shands,* at 1344. Certainly the conflict over this question could cause Harper's relationship with other officers to deteriorate.

Regarding the factor of "a close working relationship," public safety organizations require an esprit de corps, and such developments as the three requests by Sgt. Milligan for a written statement—all of which were rejected—do not augur well for the future of working relationships within the department, if an officer can refuse such requests and make such comments as the "alarm" statement without discipline. As for the time, place and manner of the speech, in *Rankin v. McPherson,* 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Supreme Court ruled that a purely private conversation will rarely justify a discharge of a public employee. The risk that a single private comment will disrupt the work place or lower morale is low, and in *Rankin* there was no suggestion that the employee's speech or ideas would reach the general public from a comment made privately to a co-worker. *Id.* at 393, 107 S.Ct. at 2901. However, in this case, Harper made a series of irate comments in two branches of a bank, witnessed by several people; this setting was likely to become known to other citizens in Sherwood. His manner was rude and angry. The time, place and manner factor weighs against plaintiff. For the related "context" factor emanating from a personal confrontation at a bank and an implied threat of unprofessional behavior regarding the bank in the future, the context component also weighs against plaintiff.

For the fifth factor, there would be no appreciable degree of public interest in plaintiff's personal remarks and frustration over his check, as well as his "I do not recall" statement when asked to give a written account. Plaintiff was not punished for any substantive position regarding banking policy, so his opposition to the 10% fee is not the relevant speech; the relevant speech, of

course, was the "alarm" statement, the personal bickering, and the refusal to give a written commentary.

Regarding the final factor, the interrelated factors discussed above would tend to indicate that the speech impeded plaintiff's ability to perform his duties; certainly if his ire against the bank might have actually caused him to hesitate briefly in an emergency situation, or if the conflict with Milligan or other officers who became aware of the incident weakened his ability to work with others, his ability to perform could be impaired. On the other hand, the Court would concede that after receiving the punishment and perhaps cooling off from the emotional confrontation at the bank, Harper's ability to perform his duties may very well have only been temporarily impaired. The final factor may not be as overwhelming as are the first five, but since the *Pickering* test is flexible and the weight to be given any one factor depends upon the circumstances of the case, the Court has no difficulty finding that the balance weighs easily against plaintiff.

Thus, although Harper's speech was not a matter of public concern and hence there is no reason to reach the *Pickering* balancing phase, the Court finds that even if it did reach the balancing test, plaintiff would clearly fail the *Pickering* balancing inquiry as well.

### OVERBREADTH

 Plaintiff requests a declaratory judgment that Rule 4.06.17 is unconstitutionally vague or overbroad. One of the traditional rules of constitutional adjudication embodies the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others. *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). As Justice Oliver Wendell Holmes once wrote, "If there is any difficulty ... it will be time enough to consider it when raised by someone whom it concerns." *United States v. Wurzbach*, 280 U.S. 396, 50 S.Ct. 167, 74 L.Ed. 508 (1930). A related principle is that constitutional rights are personal and cannot be asserted vicariously. *McGowan v. Maryland*, 366 U.S. 420, 429–430, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393 (1961). Yet, the Supreme Court has recognized a small number of limited exceptions to these principles, but only because of the most "weighty countervailing policies." *United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). One exception has been created in the realm of the First Amendment. The First Amendment requires "breathing space," and laws attempting to restrict or burden the exercise of First Amendment rights must be narrowly drawn and represent a legislative judgment that "a particular mode of expression has to give way to other compelling needs of society." *Grayned v. City of Rockford*, 408 U.S. 104, 116–117, 92 S.Ct. 2294, 2303–2304, 33 L.Ed.2d 222 (1972). As a corollary, the Supreme Court has altered its traditional rules of standing to allow in First Amendment jurisprudence "attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Dombrowski v. Pfister*, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). Litigants are therefore allowed to challenge "a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick*, supra, 413 U.S. at 612, 93 S.Ct. at 2916.

 The exception to standing requirements in overbreadth cases is "manifestly strong medicine. It has been employed by the Court sparingly and only as a last resort. Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Id.* In *Broadrick*, the Court stressed that "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, at 615, 93 S.Ct. at 2918. "The *Broadrick* Court dealt with a statute regulating public employees' political activities that

prohibited employees from contributing to political organizations or candidacies, joining a "partisan political club," or managing a political campaign. *Id.* at 601, 93 S.Ct. at 2910. Although the appellants in that case contended that the statute reached activities that are constitutionally protected as well as those that are not, the Court held that it was clearly constitutional as applied to the conduct with which they were charged "and because it is not substantially overbroad they cannot challenge the statute on the ground that it might be applied unconstitutionally to others, in situations not before the Court." *Id.* The appellants had actively participated in a political campaign, and much of their activity was conducted at government offices. In similar cases, the Supreme Court has often emphasized the limited applicability of overbreadth, ruling that "Even where a statute at its margins infringes on protected expression, 'facial invalidation' is inappropriate if the remainder of the statute ... covers a whole range of easily identifiable and constitutionally proscribable conduct ..." *New York v. Ferber*, 458 U.S. 747, 770 n. 25, 102 S.Ct. 3348, 3361 n. 25, 73 L.Ed.2d 1113 (1982); *Osborne v. Ohio*, 495 U.S. 103, 112, 110 S.Ct. 1691, 1697, 109 L.Ed.2d 98 (1990).

In a case dealing with Article 133 of the Code of Military Justice, 10 U.S.C. § 933, that punishes a commissioned officer for "conduct unbecoming an officer and a gentleman," the Supreme Court ruled that it has "repeatedly expressed its reluctance to strike down a statute on its face where there were a substantial number of situations to which it might be validly applied." *Parker v. Levy*, 417 U.S. 733, 760, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974). Defendant's citation of *Levy* might not be directly on point because that case dealt with the military, and the Court observed that "The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it." *Id.*, at 758, 94 S.Ct. at 2563. Courts have frequently held that a police department has a more significant interest in regulating the speech activities of its employees in order to foster loyalty and obedience to superior officers and instill public confi-

dence than the "typical government employer," *Crain v. Board of Police Commissioners*, 920 F.2d 1402 (8th Cir.1990) but some courts have held that level of deference to military authority and public safety organizations such as police or fire departments would not be identical. *Davis v. Williams*, 617 F.2d 1100, 1103 (5th Cir.1980); *Bence v. Breier*, 501 F.2d 1185 (7th Cir.1974). However, the Eighth Circuit has placed more emphasis upon the similarities between police regulations and military regulations:

> Police regulations, like military regulations, are generally by necessity cast in broad terms. As the Court below [*Vorbeck v. Schicker*, 498 F.Supp. 158 (E.D., Missouri 1980] pointed out,
>
> The St. Louis Metropolitan Police Department is a 1900–member para-military organization charged with police functions within the City of St. Louis which is a large section of a two and one-half million people-populated area. Their functions include riot control, traffic regulation, minor criminal matters, and major metropolitan area drug control. Members of the Police Department are engaged in both uniform activities and highly sensitive undercover operations. It is essential that they be subject to many stringent rules and regulations which would not apply to other government agencies. *Vorbeck v. Schicker*, 660 F.2d 1260, 1262–1263 (8th Cir. 1981); *cert. denied*, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982).

*Vorbeck* seems to indicate that the rule applied in the military context in *Levy* would still be basically relevant in the police department context. But even if *Levy* were construed as not being on point, in the context of another major precedent upholding a civil service dismissal, the Supreme Court upheld an exceedingly broad provision: an employee may be dismissed for "such cause as will promote the efficiency of the service." *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974). The Court stated the rationale for its conclusion that the general provision was "essentially fair" and requiring greater specificity was not feasible: the provision was not overbroad "because of the infinite variety of factual situations in which

public statements by government employees might reasonably justify dismissal for 'cause.'" *Arnett*, at 161, 94 S.Ct. at 1648. As the Fifth Circuit pointed out, *Arnett* "does not concern the military, and the catch-all language there upheld could scarcely be broader." *Davis*, supra, at 1104.

The "catch-all" phrase at issue in *Arnett* was "not directed at speech as such, but at employee behavior, including speech, which is detrimental to the efficiency of the employing agency." *Arnett*, 416 U.S. at 162, 94 S.Ct. at 1648. Similarly, Rule 4.06.17 of the Sherwood Police Department is aimed primarily at employee behavior rather than directly "at speech as such" in the general provision that "Employees shall conduct themselves at all times both on duty and off, in such a manner as to reflect most favorably on the Department. Conduct unbecoming an employee shall include that which brings the Department into disrepute or reflects discredit upon the employee as a member of the Department, or that which impairs operation or efficiency of the Department or employee." Defendant is correct that Rule 4.06.17 passes the test in *Arnett*, for the Sherwood rule is not directed against speech per se but against a wide range of employee conduct that a police department can regulate. Certainly it would not chill any appropriate speech or come as an unfair surprise to any employee that the catch-all provision would prohibit an employee from quarreling openly with employees at two bank branches and then intimating that the quarrel might affect the future performance of his duties. Simply because the Sherwood rule might apply in hypothetical scenarios to constitutionally protected speech does not mean it should be invalidated as overbroad. The Supreme Court has explicitly ruled that the mere fact that plaintiff can conceive of impermissible applications of the regulation "is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800, 104 S.Ct. 2118, 2126, 80 L.Ed.2d 772 (1984).

■ The Supreme Court has emphasized that "The bare possibility of unconstitutional application is not enough; the law is uncon-

stitutionally overbroad only if it reaches *substantially* beyond the permissible scope of legislative regulation." *Vincent*, 466 U.S. at 800 n. 19, 104 S.Ct. at 2126 n. 19. In the instant case, plaintiff's counsel asked Crockett in deposition whether the Sherwood rule would apply to certain hypothetical situations (to an officer who owned a financial interest in a store that rented sexually explicit movies, or to someone who dressed up in blackface) and Crockett said they would apply. But that approach in an overbreadth challenge was refuted by *Vincent*. The Court addresses the facts as they took place in the case at bar, and does not give advisory opinions on the basis of hypothetical situations that might occur in the future.

*Broadrick* dealt with conduct rather than speech per se; however, many courts have stressed that the distinction between speech and conduct is difficult to draw. *Magill v. Lynch*, 560 F.2d 22, 30 (1st Cir.1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978). "The trouble with the distinction between speech and conduct," the Fifth Circuit pointed out, "is that it has no real content." *Davis v. Williams*, 598 F.2d 916, 919 n. 5 (5th Cir.1979) (Quoting L. Tribe, AMERICAN CONSTITUTIONAL LAW (1978) at 599). In interpreting the *Broadrick* "substantial overbreadth" rule, some courts have ruled that conduct that verges on "pure speech" should trigger a higher level of scrutiny than mere conduct. *Paulos v. Breier*, 507 F.2d 1383, 1386 n. 6 (7th Cir.1974). The Supreme Court has held that the conduct of wearing an armband as a protest against the Vietnam War was a symbolic act closely akin to "pure speech." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In *Broadrick* itself, the conduct of taking part in political campaigns was obviously "expressive conduct." *Broadrick*, supra, 413 U.S. at 609, 93 S.Ct. at 2914. In the case at bar, plaintiff's anger at the bank and his lack of truthfulness in the investigation could be considered conduct, but the "alarm" statement was obviously speech. This speech/conduct distinction clearly is unavailing to plaintiff, for *Arnett* involved speech (plaintiff had made allegedly defamatory statements about other employees in his

agency), yet the Court upheld a regulation at least as broad if not broader than the Sherwood rule, in the context of a civil service employee at the Office of Economic Opportunity, a typical government agency that would be entitled to substantially less deference than a police department. *Arnett,* supra, 416 U.S. at 134–138, 94 S.Ct. at 1634–1636; *see also, Crain,* supra.

It is clear that "catch-all" provisions similar to Rule 4.06.17 persistently appear in the regulations of government employers of all varieties, although they are often challenged and in appropriate cases are sometimes invalidated. *Davis,* supra, 617 F.2d at 1103. The Fifth Circuit has explained the widespread use of these broad provisions:

> Fair notice consequently requires some attempt at specifying what actions constitute cause, but it may well be impossible for the mind to imagine or the hand to transcribe every sort of human misconduct that might fairly call for discipline. And if it were possible, the product would doubtless fill volumes of particulars and therefore go unread except perhaps by superiors searching out ad hoc grounds for disciplinary action already determined on.

> Thus, ironically, these catch-all provisions, so often attacked on vagueness (due process) and overbreadth (First Amendment) grounds, probably give the only notice that can practically and effectively be given that the employer thinks itself entitled to impose punishment on grounds that are not set out with particularity. They 'require ... a person to conform his conduct to an imprecise but comprehensible normative standard.' (citing *Coates v. Cincinnati,* 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971).

In numerous other cases, courts have upheld broad provisions. For example, in *Aiello v. City of Wilmington, Delaware,* 623 F.2d 845 (3d Cir.1980), the Court rejected both vagueness and overbreadth challenges directed against regulations requiring firemen to "refrain from conduct unbecoming a fireman and a gentleman whether on or off duty." Firemen were to be governed by "the customary rules of good behavior observed by law-abiding and self-respecting citizens," and

regardless of the time or place, "whether in uniform or not, members shall conduct themselves in a manner that will not bring discredit to themselves or to the Department." *Aiello,* supra, at 848. The fireman-plaintiff, Mr. Aiello, was off duty when he became intoxicated and broke into a store. He was found there the next morning by the police, although no criminal charges were filed. Aiello told the police he was a fireman and said, "please don't arrest me." *Id.* The *Aiello* Court affirmed the District Court's ruling that the regulations were not overbroad, first because it was "questionable whether his conduct fell within the purview of First Amendment activities, the cornerstone of the overbreadth doctrine," and secondly because in the case before it the Court concluded that the rules would "legitimately apply to a substantial amount of conduct or number of activities which properly may be proscribed, and the overbreadth, if any, of the rules is marginal." *Id.* at 849.

In *Aiello,* the plaintiff argued that he was punished for his speech in asking the police not to arrest him because he was a fireman. The Court ruled that "There is no indication, however, that the disciplinary proceedings initiated against him were in any way an attempt to punish him for uttering this statement." *Id.* at 854 n. 17. In Mr. Harper's case, he complains that he was punished for his statements about banking policy. The disciplinary proceedings instituted against him, however, were in no way intended to punish him for uttering the statements about banking policy; they were intended to punish him for the "alarm" statement and his conduct during the investigation. It is true that the facts of *Aiello* are somewhat different from the instant case, in that Aiello's punishment was based on his conduct in smashing windows at a store while he was intoxicated. However, the cases are similar in the sense that in both cases plaintiffs were arguing that certain speech—in *Aiello,* the fireman's statement that he should not be arrested because he was a fireman, in Harper's case, the statement about the fee policy—was the cause of the punishment, when in fact these were not the cause of the discipline imposed upon them. As stated above, if Harper's

speech had been a disinterested effort to engage in public debate about banking policy and the Police Chief had disciplined him for that speech, that would have constituted a violation of the First Amendment. Harper was not punished for the content of his speech on the fee policy.

Courts have emphasized that there is no mechanical formula that can be applied to decide overbreadth cases. As the First Circuit observed, "some sensitivity to reality is needed; an invalid application that is far-fetched does not deserve as much weight as one that is probable. The question is a matter of degree; it will never be possible to say that a ratio of one invalid to nine valid applications makes a law substantially overbroad." *Magill v. Lynch*, 560 F.2d 22, 30 (1st Cir.1977); *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978). Overbreadth cannot be determined simply by balancing the number of permissible applications. *Aiello*, at 854. The historic or likely frequency of a statute or regulation's "conceivably impermissible applications is also relevant," the Third Circuit stated, for if "that frequency is low, it may be more appropriate to guard against the statute's conceivably impermissible applications through case-by-case adjudication rather than through facial invalidation." *Id.* The rules under which Aiello was disciplined were "not directed solely at 'pure speech' but are aimed at a range of conduct and speech." *Id.* at 853. Overbreadth should further be judged by the nature of the activity or conduct sought to be regulated: "A statutory scheme which encompasses the kind of expressive and associational activity that has been traditionally held to be entitled to a high degree of First Amendment protection should be subjected to closer judicial scrutiny than one which does not." *Id.*

Finally, the nature of the state interest underlying the statute or regulation is relevant. Sections of a statute covering conduct that can be regulated can be invalidated if they are so "impermissibly broad" as to inflict a "chilling effect" upon protected speech: "This may not be an undesirable result, for the First Amendment is nonmajoritarian in nature and must in the last resort depend upon the courts for enforcement. Yet facial invalidation is not a finely honed scalpel in the hands of a judicial surgeon but a broad-blade instrument, which must be applied with restraint." *Id.* at 855. The rules in *Aiello* were upheld against the overbreadth challenge in spite of such broad phrases as "conduct unbecoming a fireman and a gentleman whether on or off duty" and "the customary rules of good behavior." The Sherwood rule refers to "conduct unbecoming an employee" whether on or off duty and conduct impairing the "operation or efficiency of the Department or employee." The Sherwood regulation was clearly not attempting to regulate "expressive and associational activity" traditionally entitled to a high level of First Amendment scrutiny. Such regulations are directed at the state interest of promoting the effectiveness of the police department and preventing public mistrust of the police. The *Aiello* Court ruled that although a few of the rules of the Wilmington department "may have arguably overbroad applications," the number of clearly valid applications far outweighed the "conceivably impermissible applications." *Id.* at 855. Thus, the facial overbreadth faded significantly in relation to the otherwise legitimate sweep of the rules. The Third Circuit's conclusion regarding the rules is relevant to the Sherwood Rule 4.06.17, which is not as broad as Wilmington's: "The thrust of Rules 169.16 [conduct unbecoming a fireman and a gentleman] and Rule 169.23 [rules of good behavior ...] is substantially aimed at conduct and speech of firemen which could reasonably be expected to have a deleterious effect upon the City's legitimate concerns for efficiency, discipline and morale within the Fire Bureau, as well as public trust in the Fire Bureau's integrity." *Id.*

Similarly, the Second Circuit in *Janusaitis v. Middlebury Volunteer Fire Department*, 607 F.2d 17, 25–28 (2nd Cir.1979) (where a member of the department was bitterly critical of the senior officers) upheld against both vagueness and overbreadth attacks a regulation that proscribed "unbecoming conduct detrimental to the welfare or good name of the Department." The Court relied on *Arnett*, which held that "the language 'such

cause as will promote the efficiency of the service' in the Act excludes constitutionally protected speech, and that the statute is therefore not overbroad." *Arnett*, 416 U.S. at 162, 94 S.Ct. at 1648. The *Janusaitis* Court followed the *Arnett* rationale, stressing that the department's regulation "does not make freedom of expression its substantial target nor is there any satisfactory way of severing the [regulation's] constitutional from its unconstitutional applications." *Janusaitis*, at 28. Many of the cases in which regulations have been found to be overbroad were specifically directed at speech: *See Gasparinetti v. Kerr*, 568 F.2d 311 (3d Cir. 1977), *cert. denied*, 436 U.S. 903, 98 S.Ct. 2232, 56 L.Ed.2d 401 (1978) (regulation prohibiting police officers from commenting unfavorably on official actions of officers or the department); *Muller v. Conlisk*, 429 F.2d 901 (7th Cir.1970) (regulation prohibiting "any activity, conversation, deliberation or discussion which is derogatory to the Police Department or any member or policy of the Department"); *Haurilak v. Kelley*, 425 F.Supp. 626, 629 (D.Conn.1977) (members of department shall not "speak critically or derogatorily" regarding superior officers).

In a recent case in the Eastern District of Arkansas, the Court upheld a broad provision in the Little Rock Police Department's regulations against an overbreadth challenge. *Tindle v. Caudell*, LR–C–93–540 (E.D.Arkansas, September 19, 1994). The Little Rock Department rules stated, *inter alia*, that "No officer shall engage in any personal act or conduct which, if brought to the attention of the public, could result in justified criticism of the officer or the Department." The *Tindle* Court noted that the Eighth Circuit has held that the proper standard of review for police regulations is the rational relationship standard. *Tindle*, at 14.[3] In *Crain*, supra, the Eighth Circuit ruled that a police department's sick leave regulations "must be reviewed deferentially and that appellants must show that the regulations bear no rational relationship to a legitimate state interest." *Crain*, at 1406. The Supreme Court has distinguished "between the standard of review to be applied when laws limiting constitutional rights are challenged by an ordinary citizen and when they are challenged by an employee of a city's police department." *Crain*, at 1407, citing *Kelley v. Johnson*, 425 U.S. 238, 244–45, 96 S.Ct. 1440, 1444–45, 47 L.Ed.2d 708 (1976). Because of this "highly significant" distinction between a police officer and an "ordinary citizen," the Supreme Court held that a police officer must "'demonstrate that there is no rational connection' between the regulation, based as it is on the [local] method of organizing its police force, and the promotion of safety of persons and property." *Vorbeck*, at 1266; *Kelley*, 425 U.S. at 244, 247, 96 S.Ct. at 1444, 1446. The Sherwood regulations would clearly meet the "rational relationship" test, as the rules are rationally related to instilling public trust in the department, preserving department morale, and promoting the effectiveness of the police. One of the goals of these regulations was to place limits on police action, and not the actions of individuals. Citizens should not be subjected to implied threats that an officer will not fulfill his duties as a result of personal pique. Moreover, the Court in *Vorbeck* stressed that "a state may demand of its police officers a more exacting standard of conduct than it could validly impose by criminal statute on citizens in general." *Vorbeck*, at 1267 (Arnold, J., concurring).

**3.** The facts in *Tindle* are completely different from those in Harper's case. Plaintiff Kevin Tindle is a Little Rock police officer who appeared dressed in blackface with an "Afro" wig, and carrying a watermelon, at a Halloween party held at the Fraternal Order of Police Lodge. Some black officers of the Little Rock Police Department were offended, and Tindle was ultimately given a 30–day suspension.

This Court refers to *Tindle* only regarding the question of whether the Little Rock Police Department regulations are overbroad.

Rule 1/4003 of the Little Rock Department is roughly similar to the broad provision Rule 4.06.17 of Sherwood. Rule 1/4006 is a somewhat different rule stating that "No officer shall at any time ridicule, mock, deride, taunt, or belittle any person. Neither shall he/she willfully embarrass, humiliate, nor shame any person nor do anything that might incite a person to violence.

In the District Court ruling in *Vorbeck,* the Eastern District of Missouri upheld rules that included such broad phrases as conduct "unbecoming a member of the Department" and conduct "detrimental to the public peace or welfare." *Vorbeck v. Schicker,* 498 F.Supp. 158 (E.D., Missouri 1980). The Eighth Circuit affirmed, although on the grounds that none of the plaintiffs had ever been disciplined under the regulations and therefore no "case or controversy" was presented to the Court. *Vorbeck v. Schnicker,* 660 F.2d 1260, 1264 (8th Cir.1981); *cert. denied,* 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982). However, the Eighth Circuit in *Vorbeck* also made the comparison cited above that police regulations are similar to military regulations in being "by necessity cast in broad terms." *Vorbeck,* at 1262. Although the Eighth Circuit did not reach the overbreadth issue, the Court stated that despite the broad language of the police rules at issue, "we also recognize that such breadth may lend itself to excesses and arbitrariness in enforcement, but assume that these regulations will, as a matter of legitimate governmental interest, be made more specific in their individual application to concrete situations and thus be substantially limited in their administration. No excesses have been demonstrated here." *Id.* at 1266. This passage appears reminiscent of the *Aiello* Court's statement that if the relative frequency of "impermissible applications" is relatively low, then "it may be more appropriate to guard against the statute's conceivably impermissible applications through case-by-case adjudication rather than through facial invalidation." *Aiello,* at 854. There is no indication that the Eighth Circuit in *Vorbeck* disagreed with the District Court's rejection of the overbreadth challenge. Moreover, in a concurrence Judge Arnold stated that a "case or controversy" was presented, and that "I would affirm the judgment of the district court dismissing on its merits the claim of facial unconstitutionality . . . I would hold the regulations valid on their face, without prejudice, of course, to any later claim that they may be invalid as applied to particular persons or situations." *Vorbeck,* at 1267 (Arnold, J., concurring).

One of the factors courts consider in overbreadth cases is whether the statute or regulation is directed against particular groups or viewpoints. *Broadrick,* 413 U.S. at 616, 93 S.Ct. at 2918. The Sherwood regulation is generally directed at conduct that would be disruptive to the police department, and is not a censorial regulation aimed at specific groups or viewpoints. Plaintiff cites *Police Dept. of Chicago v. Mosely,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972), which states the principle that "The First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." It is certainly true that government regulations that discriminate on the basis of the content of the message cannot be tolerated under the First Amendment, but the Sherwood regulation has no restriction concerning message, ideas or content. *Regan v. Time, Inc.,* 468 U.S. 641, 648–649, 104 S.Ct. 3262, 3266–3267, 82 L.Ed.2d 487 (1984); *Texas v. Johnson,* 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). It would be unreasonable to argue that any of the police department regulations had anything to do with prohibiting banking policy, although that is precisely the topic that plaintiff alleges was the relevant speech that was punished. The Sherwood regulations are content-neutral.

## VAGUENESS

Regarding plaintiff's allegation that the Sherwood police regulations are void for vagueness, Mr. Harper must first show that the regulation is vague as applied to his own conduct, regardless of any potential it has for vague application to other people. When a litigant's conduct is covered by a regulation, that party does not have standing to attack the regulation's vagueness, although it might be vague as applied to others. *Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 1191 n. 7, 71 L.Ed.2d 362 (1982); *Parker v. Levy,* 417 U.S. 733, 756, 94 S.Ct. 2547, 2561, 41 L.Ed.2d 439 (1974); *Aiello* at 850. As the Supreme Court has defined the void for vagueness doctrine, it "reflects the principle that 'a statute which either forbids or requires the doing of an act in terms so vague that [per-

sons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Roberts v. United States Jaycees,* 468 U.S. 609, 629, 104 S.Ct. 3244, 3256, 82 L.Ed.2d 462 (1984); citing *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). As Justice Brennan observed in *Roberts,* "the requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review." *Roberts,* 468 U.S. at 629, 104 S.Ct. at 3256; *See, e.g., Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972).

 The standards for evaluating vagueness were enunciated in *Grayned v. City of Rockford,* 408 U.S. 104, 108–109, 92 S.Ct. 2294, 2298–2299, 33 L.Ed.2d 222 (1972):

Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications.

The Court emphasized that these standards cannot be mechanically applied. The degree of vagueness that is constitutionally permissible, "as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Id.* There is greater tolerance for civil enactments rather than criminal penalties because the "consequences of imprecision are qualitatively less severe." The most important factor affecting the clarity that the Constitution requires is whether it inhibits the exercise of free speech or other constitutionally protected rights. *Id.* The prohibition against vagueness applies to administrative regulations as well as to statutes. *Vorbeck,* supra, 660 F.2d 1260, 1262.

Defendant correctly points out as an initial matter that the Sherwood rules are not criminal and are designed, *inter alia,* as restraints on the conduct of police officers. Defendant is also correct that it defies common sense for Mr. Harper to contend that he did not have fair notice that his conduct at the bank and in the investigation constituted grounds for disciplinary action. Even with no written rules at all, a police officer would know that he might be suspended—if not fired—for publicly quarreling with employees at two bank branches and threatening that his response to a robbery alarm might be slower as a result of the quarrel; and then failing to give a written statement regarding the incident.

 Plaintiff was not "arbitrarily and capriciously" deprived of his pay by the 30–day suspension. Rules 4.06.13 and 4.06.33 clearly gave him notice that during an administrative investigation an employee will "truthfully answer all questions specifically directed to them regarding the investigation" upon orders of "the Chief's designee," and an "employee shall give truthful statements at all times regarding the scope of employment and operations of the Department." Milligan's request for a written statement in the context of an official investigation was clearly within the scope of the Department's operations. As a matter of common sense, Harper should have known even without any rules that he should have been truthful in an internal investigation and should have written some reasonable account rather than merely writing, "I do not recall."

 Sherwood's Rule 4.06.17 regarding conduct that reflects discredit upon the department is part of a larger set of rules. Courts have held that these rules are not to be judged standing alone but must be viewed in context with other rules. Rule 4.06.17

applies to "undesirable conduct not specifically forbidden by other, more specific rules but of the same general kind." *Davis v. Williams*, supra, at 1103. Defendant provides an apt example in citing Rule 4.06.05, which prohibits solicitation of gifts from businesses that could be substantially affected by the performance or non-performance of an official duty. An officer would have fair notice that Rule 4.06.17 would cover the activities of threatening a business with non-performance of a duty unless the business showed favoritism to the officer by treating him differently from other customers and not applying a policy to him. "One to whose conduct a statute clearly applies may not successfully challenge it for vagueness," and since Harper's conduct clearly falls within the purview of the regulation, he lacks standing to bring the vagueness claim.

Even if the Court were to decide that Harper does have standing regarding the vagueness challenge, the regulation on its face cannot be declared unconstitutionally vague, because the Court must declare it "impermissibly vague in all its applications." *Hoffman Estates*, supra, 455 U.S. at 497, 102 S.Ct. at 1192. The requirements for facial invalidation for vagueness are stringent: the enactment cannot "leave open . . . the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against." *United States v. Cohen Grocery Co.*, 255 U.S. 81, 89, 41 S.Ct. 298, 300, 65 L.Ed. 516 (1921). The fact that "doubts as to the applicability of the language in marginal fact situations may be conceived" does not make an enactment unconstitutionally vague on its face. *United States v. Powell*, 423 U.S. 87, 93, 96 S.Ct. 316, 320, 46 L.Ed.2d 228 (1975).

Rule 4.06.17 is not impermissibly vague in all its applications. The "alarm" statement would obviously bring the department into public contempt and easily "reflect discredit upon the employee as a member of the department." He was sworn to uphold the law and in a fit of anger he intimidated members of the public at the bank branches and implied he would not fulfill his duties in upholding the law.

Plaintiff cites *Bence v. Breier*, 501 F.2d 1185 (7th Cir.1974); *cert. denied*, 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821. The *Bence* Court held that a police department rule proscribing "conduct unbecoming a member and detrimental to the service" was unconstitutionally vague; but even if it was not vague facially, it was vague "as applied" to city policemen who as members of the policemen's collective bargaining unit, sent a letter to the city's labor negotiator outlining a bargaining demand in the next round of negotiations. *Id*. *Bence*, however, can be distinguished from *Aiello* and the numerous cases in which similarly broad provisions were upheld; as the Third Circuit explained in *Aiello*, "The act which triggered the charge was the sending of a letter critical of departmental policy. The act was plainly activity protected by the First Amendment and not 'hardcore conduct' as is the case here [fireman's conduct in smashing store windows while intoxicated]." *Aiello*, at 851 n. 11. Moreover, the reasoning in most other cases has differed from that in *Bence*. Myriad courts have upheld broad provisions, as noted above. *See, e.g., Aiello*, supra; *Janusaitis*, supra; *Davis v. Williams*, supra (explaining the rationale for broad provisions in public safety organizations' regulations); *Allen v. City of Greensboro*, 452 F.2d 489, 490 (4th Cir.1971) ("conduct unbecoming to an officer and a gentleman"); *Kannisto v. City and County of San Francisco*, 541 F.2d 841, 842 (9th Cir.1976) ("conduct . . . which reflects discredit upon . . . efficiency and discipline"); *Rode v. Dellarciprete*, 651 F.Supp. 940 (M.D.Pa.1986) conduct "which tends to bring the Department and/or Commonwealth into disrepute or reflects discredit upon the individual employee". The vast weight of authority indicates that general provisions such as the Sherwood rule are facially valid.

The Eighth Circuit has interpreted *Bence* as having distinguished *Parker v. Levy*, supra, on the grounds that the Supreme Court in *Levy* had "indicated that the military regulations were upheld because the 'seemingly imprecise' standards had gained acceptable meaning through custom and usage." *Vorbeck*, supra, at 1263. The *Bence* Court concluded that although the phrase "conduct

unbecoming an officer and a gentleman" had attained a fixed and certain content in the military which was constitutionally sufficient to withstand an attack on vagueness grounds, that content had not necessarily been transferred to the Milwaukee Police Department. *Id.* Regarding the broad provisions in the St. Louis Police Department regulations quoted above, the Eighth Circuit observed that the Missouri Supreme Court had expressed its expectation regarding vagueness, that the regulations "will be administered in a manner consistent with their legitimate purpose. 'We may legitimately assume' that by custom, usage and 'experience' a reasonable degree of 'specificity' has been afforded in the application of the regulations ..." As the United States Supreme Court has held regarding this basic question, "Although it is possible that specific future applications ... may engender concrete problems of constitutional dimensions, it will be time enough to consider any such problems when they arise." *Seagram & Sons v. Hostetter,* 384 U.S. 35, 52, 86 S.Ct. 1254, 1265, 16 L.Ed.2d 336 (1966).

In his motion for a declaratory judgment that the Sherwood regulations are unconstitutional, plaintiff contended that defendant stated in deposition that if a police officer had a financial interest in a video store that rented X-rated movies, this would bring disrepute on the department and violate its regulations. Plaintiff's use of hypothetical arguments in this manner does little or nothing to help his argument. Plaintiff contends that when Crockett made the statement and said he would punish an officer who had an "interest in a video store that sold legally permissible material but that which would be obscene to some segments of the community, he disregarded the holding in *Flanagan v. Munger,* 890 F.2d 1557 (10th Cir.1989), where the Court found that it was protected First Amendment [expression] for police officers to hold a partnership interest in a video store that rented X-rated movies." (Memorandum of Law in Support of Plaintiff's Complaint for Declaratory Judgment, at 3–4). Plaintiff's reliance on *Flanagan* is misplaced. First, the underlying expression in *Flanagan* was clearly protected by the First Amendment, in contrast to Harper's personal expressions of anger and frustration, which are not protected. A long line of cases before *Flanagan* held that "Sexually explicit films and the distribution of sexually explicit films have consistently been upheld as protected under the First Amendment, whether under the free speech or free press clauses." *Flanagan,* at 1564; *See Erznoznik v. Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975); *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Times Film Corp. v. Chicago,* 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961).

Furthermore, *Flanagan* is squarely against plaintiff on the vagueness question. The plaintiffs brought a vagueness challenge against Colorado Springs Police Department regulations that stated, "standards of conduct for police personnel are higher than standards applied to the general public. In this regard Department members will conduct themselves in a manner which does not bring discredit upon individuals, the Department, the City of Colorado Springs or the community." Another regulation provided that officers shall conduct themselves "both on and off duty in such a manner as to reflect most favorably on the Department." The Tenth Circuit in *Flanagan* held that the regulations were not vague on their face. *Flanagan,* at 1569. The Court conceded that the rule was not precise in specifying proscribed conduct or in establishing a standard by which an officer could evaluate the "propriety of proposed conduct, broad rules such as ones condemning 'conduct unbecoming an officer' or, as here, conduct impairing the operation or efficiency of the department or bringing the department into disrepute, have been generally upheld against challenges of facial vagueness." *Id.; See also Puzick v. City of Colorado Springs,* 680 P.2d 1283 (Colo.App.1983). Capacious phrases such as the one in the Colorado Springs Manual are "unavoidable. They nevertheless provide adequate notice to police officer that their conduct, both on and off duty, must meet a high standard of comportment." *Id.* In concluding that the regulations were not facially vague, the Tenth Circuit cited the oft-quoted opinion of Judge Leventhal in *Meehan v.*

*Macy,* 392 F.2d 822, 835 (D.C.Cir.1968), modified, 425 F.2d 469, *aff'd,* 425 F.2d 472 (1969):

> It is not feasible or necessary for the government to spell out in detail all that conduct which will result in retaliation. The most conscientious of codes that define prohibited conduct of employees includes 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'

The *Flanagan* Court, after having found that the broad provisions were not facially vague, then addressed the issue of whether they were vague as applied, and reversed the District Court because its decision on vagueness had been based upon the conclusion that plaintiffs' underlying speech was not protected. The case was remanded for a determination as to whether the regulations were vague as applied. *Flanagan* is thus of no aid to plaintiff, for the Court dealt with expression that was protected, and the Court rejected a vagueness challenge against regulations that were roughly similar to those in the case at bar.

## CONCLUSION

Plaintiff's expression was not a matter of public concern. Even if the Court were to rule that his speech was a matter of public concern, it still fails the second, "balancing" prong of the judicial inquiry stated in *Pickering.* The Sherwood rules are not unconstitutionally overbroad or vague. There are no genuine issues of material fact. Defendant's motion for summary judgment is granted.

It is so ordered.

## *JUDGMENT*

Pursuant to the Order filed today, defendant's motion for summary judgment is granted. All matters having been resolved in this case, it is hereby dismissed with prejudice.

It is so ordered.