Robert Michael DAVIS et al.,
Plaintiffs-Appellees,

v.

Lewis WILLIAMS et al.,
Defendants-Appellants.

No. 77–1299.

United States Court of Appeals,
Fifth Circuit.

May 19, 1980.

Don J. Rorschach, City Atty., John W. Chandler, Robert S. McGrath, Asst. City Attys., Irving, Tex., for defendants-appellants.

Frederick M. Baron, Dallas, Tex., for plaintiffs-appellees.

Michael S. Wolly, Washington, D. C., amicus curiae.

Before COLEMAN, Chief Judge, and BROWN, AINSWORTH, GODBOLD, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON and THOMAS A. CLARK, Circuit Judges.*

* Judge Goldberg was a member of the en banc court under 28 U.S.C.A. § 46(c) and participated in the oral argument of the case en banc. Since that time he has taken senior status and therefore does not participate in this decision. Judge Charles Clark did not participate in the consideration or decision of this case.

GEE, Circuit Judge:

Intransigence and a leavening of imprudence have transmuted this personnel controversy in the Irving, Texas, fire department into a constitutional one.

In 1976 the Irving city fathers decided to take over an ambulance service and have the fire department operate it. The local fire fighters' association, an appellee here, took the view that many new people would have to be hired to do this. Appellant Williams, the fire chief, thought only a few more would be needed. The matter became a public issue on which feelings within the department ran high.

Following a budget meeting at which Chief Williams defended his minimal hiring plan, the fire fighters' association held its own meeting and prepared an open letter to Williams, denouncing his leadership and accusing him, among other things, of gambling with their lives and those of the citizenry and of failing to stand up for the special interests of the fire fighters. Learning that this letter was being circulated for signatures, the local newspaper made for the troubled waters with baited hook. A reporter informed Williams of the impending letter. Williams declined comment before seeing it and called appellee Davis, the association's president. When Davis acknowledged circulation of the letter, Chief Williams reminded him of the existence of established grievance procedures.

Next the reporter approached Davis, who obliged him with comments, based on the letter, that were bannered in next morning's paper:

> IPFFA president Mike Davis said the "morale of the fire department has steadily dropped since the chief has assumed the leadership of the department more than eight years ago.
>
> "We feel the chief has never really assumed his leadership responsibilities, and as a result of his eight years as chief, the morale of the department is at an all-time low.

> "We realize this [the letter] is a serious measure and may permanently sever our relationship with the chief, but we wish to bring this situation to the attention of city management and the general public."

Chief Williams, feeling his authority and position traduced and intending to punish Davis if he could, consulted the city attorney for legal advice. He then suspended Davis indefinitely by a written order, which cited as its authority the following:

IRVING DEPARTMENT OF FIRE
RULES & REGULATIONS

ARTICLE 5.3   MEMBERS

\*       \*       \*       \*       \*       \*

All members shall:

\*       \*       \*       \*       \*       \*

41. Refrain from being a party to any malicious gossip, report, or activity that would tend to disrupt department morale or bring discredit to the department or any member thereof; or making derogatory statements or adversely criticizing department policy, activities, or officers, except by written report to the Chief of the Department, through channels.

\*       \*       \*       \*       \*       \*

ARTICLE 5.5   OFFENSES

Offenses are punishable by reprimand, reduction in rank, suspension, or dismissal.

A.   Offenses

\*       \*       \*       \*       \*       \*

(5) Conduct prejudicial to good order.

\*       \*       \*       \*       \*       \*

ORDINANCE NO. 2201 CITY OF
IRVING, TEXAS

\*       \*       \*       \*       \*       \*

SECTION 37.   GROUNDS   FOR   REMOVAL OR SUSPENSION

\*       \*       \*       \*       \*       \*

(8) Conduct prejudicial to good order;

\*       \*       \*       \*       \*       \*

The order then continued by reciting the facts leading up to Davis' statements to the newspaper and quoting his comments set out above. It concluded:

In this article, a copy of which is attached hereto, Robert Michael Davis is quoted repeatedly criticising my leadership as Chief and making statements that have certainly tended to disrupt department morale.

Based upon an overall review of the conduct of Fire Equipment Officer II, Robert Michael Davis in this matter, including the violations of the Fire Department Rules and Regulations and City of Irving Ordinance No. 2201, I have given Fire Equipment Operator II, Robert Michael Davis an indefinite suspension for each such separate action and violation.

This suit followed, proceeding under 42 U.S.C. § 1983 and contending, among other things, that the above provisions are vague, overbroad, and facially unconstitutional under the first and fourteenth amendments. The district court held that they were unconstitutional, both facially and as they had been applied to Davis.[1] It therefore enjoined enforcement of the provisions and ordered Davis' reinstatement, with costs and attorney's fees. On this appeal, Chief Williams, the commission, and the city (hereafter collectively referred to as the city) complain only of that portion of the judgment that holds facially invalid the rule and ordinance against "[c]onduct prejudicial to good order."[2] We are thus to determine whether such a provision, as applied to the behavior of municipal fire fighters, is so vague or overbroad as to offend the Constitution. Our inquiry is somewhat narrowed, however, by the context of this case.

1. The court's formal findings, so far as pertinent here, were:

4. The court finds that Article 5.3 ¶ 41 and Article 5.5 ¶ 5 of the Irving Fire Department Rules and Regulations and Ordinance 2201, Section 37 ¶ 8 of the City of Irving, Texas, are vague, overbroad and otherwise facially unconstitutional in that they prohibit conduct protected by the First Amendment to the United States Constitution.

5. The Court finds that the said Regulations and Ordinances, as stated above, are being applied by the defendant, LEWIS WILLIAMS, in a manner so as to deprive the Plaintiffs of their rights protected by the First Amendment to the United States Constitution.

Its underlying reasons are made clear by its informal rulings from the bench:

In light of the authorities, *Arnett versus Kennedy*, 416 U.S. 134 [94 S.Ct. 1633, 40 L.Ed.2d 15], I have concluded that this regulation is unconstitutional on its face and in its application in this case.

Now, certainly public employment carries with it certain limitations on one's right to speak, and the Supreme Court has spoken on that, but this regulation, I think, goes far beyond the limitations permitted under the *Arnett* case. This regulation just absolutely prohibits Irving firemen from making derogatory statements, whether those statements concern job issues or private matters or whether they are made to the press, to other firemen or to family members in the privacy of the home or anywhere. And what is a derogatory statement? That's a matter, I think, of vagueness and indefiniteness and doesn't provide sufficient guidance to ascertain standards of conduct that are prohibited.

\* \* \* \* \* \*

MR. RORSCHACH: Your Honor, I may be interrupting but in addition to the rule you just cited, there is a rule which was set forth in the suspension "conduct prejudicial to good order" also. We need to find out whether that one is violative because that's part of the state statute.

THE COURT: I think it is for overbreadth and vagueness. And, of course, as I understand it, under the record in this case contrary to the good order—what's the language.

MR. RORSCHACH: Conduct prejudicial to good order.

THE COURT: Conduct prejudicial to good order. The only conduct was in conversation, as I understand it, which is the infringement of First Amendment rights and I do think its overbroad.

2. Mr. Davis was long ago reinstated, with back pay; and the city describes its appeal, in its brief to us en banc, as "perfected . . . to challenge the Trial Court's ruling that 'conduct prejudicial to good order' . . . is unconstitutional on its face." Thus, the city prudently abandons its attack on the conclusion of the court below that Mr. Davis could not, consistent with the first amendment, be disciplined under the municipal provisions concerned for sponsoring the firm but temperate criticism of Chief Williams reported in the newspaper and quoted above.

In the first place, the city remains enjoined, by that portion of the judgment from which it did not appeal, from enforcing article 5.3(41),[3] that portion of the rules most offensive to the first amendment. In the setting of this case, therefore, the provisions of article 5.3(41) must be viewed as subtracted from the general catch-all ordinance, since, if they cannot be enforced as specific prohibition, no more can they be enforced as subsumed in a general one. Second, the catch-all prohibition comes to us not standing alone but rounding out a lengthy list of more specific provisions pertaining to such proscribed categories of conduct as "insubordination," "absent without leave," and the like. Obviously, it is not intended that the catch-all provision re-prohibit in general terms what other provisions of the rules have already forbidden in specific ones. Nor, if it were so intended, can we envision how it would add weight to a specific charge: "insubordination prejudicial to good order," for example, seems to amount to no more than "insubordination." We therefore conclude that the provision in these fire department rules condemning "[c]onduct prejudicial to good order" is properly viewed as applying to undesirable conduct not specifically forbidden by other, more specific rules but of the same general kind. Thus, it falls in the category of such venerable omnibus clauses as those punishing "conduct unbecoming an officer and a gentleman," art. 95 of the old Articles of War (presently brought forward as art. 133, Uniform Code of Military Justice), and art. 134 of that Code, punishing "disorders and neglects to the prejudice of good order and discipline . . . ."[4]

As was noted in the dissent from our panel's opinion,[5] catch-all provisions such as this persist in military and civil-service codes, though often challenged and sometimes invalidated on grounds such as those asserted here. *See, e. g., Bence v. Breier*, 501 F.2d 1185 (7th Cir. 1974), and *generally*, Note *Vagueness Doctrine*, 53 Tex.L.Rev. 1298 (1975). The reason why they continue to appear seems manifest. For in private employment, one can be disciplined or discharged for almost any reason or for no reason; that this arrangement obtains is generally known. In civil-service employment, by contrast, discharge or discipline must rest on "cause." Fair notice consequently requires some attempt at specifying what actions constitute cause, but it may well be impossible for the mind to imagine or the hand to transcribe every sort of human misconduct that might fairly call for discipline. And if it were possible, the product would doubtless fill volumes of particulars and therefore go unread—except perhaps by superiors searching out *ad hoc* grounds for disciplinary action already determined on.

Thus, ironically, these catch-all provisions, so often attacked on vagueness (due process) and overbreadth (first amendment) grounds,[6] probably give the only notice that can practically and effectively be given that the employer thinks itself entitled to impose punishment on grounds that are not set out with particularity. They "require . . . a person to conform his conduct to an imprecise but comprehensible normative standard." *Coates v. Cincinnati*, 402 U.S. 611, 614, 91 S.Ct. 1686, 1688, 29 L.Ed.2d 214 (1971). For example, in *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Supreme Court upheld a civil-service dismissal for "such cause as will promote the efficiency of the service." It did so on reasoning that the quoted standard was "essentially fair" and that requiring greater specificity was not feasible "be-

---

3. The "derogatory statements-adverse criticism" provision quoted in text above.

4. Arts. 133 and 134 appear at 10 U.S.C. §§ 933 and 934.

5. From which we borrow liberally and sometimes literally, without further attribution. 598 F.2d 916.

6. Despite their different bases, the doctrines overlap considerably. See *Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972), and *Smith v. Goguen*, 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

cause of the infinite variety of factual situations in which public statements by government employees might reasonably justify dismissal for 'cause.'" *Id.* at 161, 94 S.Ct. at 1648. And in *Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Court sustained against a vagueness challenge art. 134, Uniform Code of Military Justice, which contains language almost identical to that attacked here, forbidding "disorders and neglects to the prejudice of good order   .   .   .."[7] Were the Irving Fire Department a military unit, we would regard *Levy* as controlling authority, closely in point, and would tarry no longer.

But the fire department is not such a unit. It is at most quasi-military and partakes even of this quality only or chiefly when on duty. The Court relied strongly in *Levy* on the military context and tradition, and we are loath to equate a municipal fireman with a paratrooper or even with such a quasi-soldier as the recalcitrant officer-dermatologist Levy. Military society, to function at all, appears inexorably to work itself out at least partly in terms of status and to require something more in terms of performance than mere efficiency, of conduct than mere failure to stampede the carriage horses. We do not, therefore, regard *Levy* as squarely controlling.[8] *Kennedy*, however, does not concern the military, and the catch-all language there upheld could scarcely be broader.[9]

It is necessary, in such cases as this, to analyze the character of the employment concerned and the strength of the governmental interest in regulating the conduct of the employee in the manner chosen, balancing the interests of the employee as citizen against the government's need to control him as employee. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). It is certainly possible to isolate discrete elements within the analysis: size of the unit to be controlled; disparateness of function within it; the need for discipline, on or off the job; and so on. Such meticulous analysis and balancing is perhaps a task more appropriate for the Supreme Court than for us, especially where new ground is to be plowed in dangerous territory.[10] Here, we conclude, we are spared that task because the Court has already performed it in book-end situations, *Levy* and *Kennedy*.

*Levy, supra,* upheld the criminal conviction and incarceration of a military officer for pure political speech under a statute fully as broad and vague (disorders and neglects to the prejudice of good order and discipline) as this ordinance. *Arnett, supra,* upheld against like attacks the discharge of a civil servant for publicly and recklessly charging his supervisor with misfeasance under a provision even broader (such cause as will promote the efficiency of the service). Fireman Davis' relatively temperate

---

**7.** *See also Civil Service Commission v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), upholding the Hatch Act's severe restrictions on political activity by federal employees against attack on vagueness and overbreadth grounds, and *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), sustaining a similar state statute against like attacks. As the Court noted in a subsequent opinion, these trammelled activities are ones "lying at the core of the First Amendment." *Kelley v. Johnson*, 425 U.S. 238, 245, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976).

**8.** In a case involving the grooming code of a New York county police department, a more analogous unit to ours, the Court seemed to indicate that though such organizations may not be paramilitary in such a sense as to draw support for their codes from historical prescription, yet the choice by their sponsors of a military-type organizational structure as a practical administrative solution deserves deference. *Kelley v. Johnson*, 425 U.S. 238, 246, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976).

**9.** Nor was that language significantly limited in breadth by its two sets of accompanying regulations, each of which incorporated its own catchall provision against "criminal, infamous, dishonest, immoral or notoriously disgraceful conduct, *or other conduct prejudicial to the Government.*" *Arnett v. Kennedy*, 416 U.S. at 141 nn. 5 and 6, 94 S.Ct. at 1638 nn. 5 and 6 (emphasis added).

**10.** *See Brown v. Glines*, —— U.S. ——, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), upholding against first amendment attack a prior restraint on a serviceman's circulation on base of a petition.

and germane public expressions clearly fall in a different category from these;[11] and, as we have noted, the city authorities wisely did not bring to us the issue of whether the ordinance, as applied to punish these, was infirm or whether the specific provision against derogatory statements or adverse criticism was valid—either facially or as applied to Mr. Davis.

But the Irving catchall rule and ordinance condemning conduct by firemen prejudicial to good order cannot, in view of the authorities we have considered and discussed, be held facially—always and however applied—invalid. Clearly it falls somewhere on the spectrum between *Arnett* and *Levy*. To strike it down, therefore, would require a departure that is beyond our powers. The judgment of the district court, insofar only as it declares this provision facially unconstitutional and enjoins its enforcement in any manner, must therefore be

REVERSED.

THOMAS A. CLARK, Circuit Judge, specially concurring:

I concur in the result and in most of the reasoning of the majority opinion en banc. The language of the dissent to the panel opinion,[1] however, emphasizing the very small degree to which first amendment considerations are implicated in the posture of the case as it reaches us, more closely expresses my views. I therefore adopt it as mine.

ALVIN B. RUBIN, Circuit Judge, with whom GODBOLD, KRAVITCH, FRANK M. JOHNSON, Jr., HATCHETT, TATE and SAM D. JOHNSON, Circuit Judges, join, dissenting.

Respectfully, I dissent from the majority opinion. My brethren accept a limitation on the freedom of speech of municipal employees by a regulation consisting of a bare "catch-all provision" because it is the "only

notice that can practically and effectively be given that the employer thinks [himself] entitled to impose punishment on grounds that are not set out with particularity." Generality of proscription may be tolerable when directed at conduct. However, it cannot be sanctioned when it stifles freedom of expression. In accommodating the first amendment to the apparent needs of the government as employer, my brethren put a false dilemma: if the governmental authorities are to discipline employees they must either adopt a rule so vague that it gives no notice to employees or they must formulate an encyclopedia of particulars. The simple answer to the apparent riddle is easy: a governmental body is not required to inhibit the freedom of expression of its employees; if it seeks to do so, then it must warn clearly what exercises of first amendment rights so far abuse the employment relationship that they constitute cause for discipline.

The statement of facts in the majority opinion is completely accurate. It fails, however, to focus on the single most important subject: whether the ordinance applies when an employee engages in speech or other self-expression that is deemed by his superiors to be "prejudicial to good order." At the trial, in its brief and in oral argument the city asserts that speech can be thus condemned. Perhaps in recognition of the possible reach of that phrase, the majority limits it by a sort of *ejusdem generis* rule, "undesirable conduct not specifically forbidden by other, more specific rules but of the same general kind." The city can, of course, revise the ordinance so as to prohibit its application to constitutionally protected speech, but the legislative body has made no such effort, and instead defends the ordinance in its full scope. Were we a state court, we could so reinterpret state codes, to attempt to bring them into constitutional line, but, as a federal court, we lack that power. *Gooding v. Wilson*, 405 U.S. 518,

---

11. *Cf. Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (germane, if raucous, private expressions).

1. 598 F.2d at 922–924.

520, 92 S.Ct. 1103, 1105, 31 L.Ed.2d 408, 413 (1972); *United States v. Thirty-seven (37) Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1405, 28 L.Ed.2d 822, 829 (1971).

Davis was not discharged for punching the chief in the nose, for damaging city property or for driving a fire truck with wild abandon. He was fired for talking to a newspaper reporter. He now knows that the ordinance was unconstitutional as applied to him. Other employees do not have the assurance that other speeches on other subjects will be similarly protected. When considering the validity of the ordinance on its face, we must consider not only whether it prohibits unruly actions but whether it might reach an attempt to express sentiments that do not meet with approval of a governmental superior. More important, the employee must consider before he speaks the possibility that he will be discharged or disciplined if he gives utterance to his thoughts. This inhibition is properly characterized as a chilling effect, for it can hardly fail both to deter all but the bravest and to limit expression by others to the safe and the accepted.

The conduct-prejudicial-to-good-order standard, even when Article 5.5 is narrowed by eliminating whatever was forbidden by Article 5.3, is designed to forbid not only actual speech and writing but also behavior that is communicative and, hence, shielded by the first amendment. Municipal employees must not be discharged pursuant to a scheme that stifles the exercise of fundamental personal liberty. *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). The vice in the ordinance is that it is overbroad in reaching first-amendment-protected conduct, and vague in its definition of what kind of expressive conduct is or is not prohibited.

Whether such a general standard is so vague that it cannot constitutionally be applied to government employees has twice been considered by the Supreme Court. Both cases are cited and relied upon by the majority. With deference to my brethren, I read them differently as applied to the issue before us. Neither of them sanctions proscriptions against free speech by phrases Delphic in brevity and obscurity.

In *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), the Court considered a provision of the Lloyd-LaFollette Act, 5 U.S.C. § 7501, which provides that a federal civil service employee may be removed or suspended without pay "only for such cause as will promote the efficiency of the service." The statute was upheld on the premise that its language "excludes constitutionally protected speech, and that the statute is therefore not overbroad." 416 U.S. at 162, 94 S.Ct. at 1648, 40 L.Ed.2d at 38. The Court emphasized the interpretative history of the statute, the availability of government counsel to employees who seek advice on the meaning of the act and its regulations, and the administrative interpretation of the statute by the Civil Service Commission, whose "longstanding principles of employer-employee relationships, like those developed in the private sector, should be followed in interpreting the language used by Congress." *Id.* at 160, 94 S.Ct. at 1647, 40 L.Ed.2d at 36.

None of these buttresses supports this ordinance. There is no state court interpretation that safeguards constitutionally protected speech, there is no counsel to advise on the ordinance and there is no administrative history. Davis was discharged, and remained unemployed until he invoked the aid of a federal court; only then did he know that he was safe in speaking to a reporter. If his fellow firemen now wish to espouse wages considered horrendous by the chief, they have no assurance that this advocacy will not be considered prejudicial to good order.

*Parker v. Levy*, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), lends no greater support to the ordinance. While the Court held valid provisions of the Uniform Code of Military Justice proscribing "conduct unbecoming an officer and a gentleman" (10 U.S.C. § 933) and "all disorders and neglects to the prejudice of good order and discipline in the armed forces" (10 U.S.C. § 934), it stressed that each of these articles had been:

construed by the United States Court of Military Appeals. or by other military authorities in such a manner as to at least partially narrow its otherwise broad scope.

\* \* \* \* \* \*

The effect of these constructions of Arts. 133 and 134 by the Court of Military Appeals and by other military authorities has been twofold: It has narrowed the very broad reach of the literal language of the articles, and at the same time has supplied considerable specificity by way of examples of the conduct which they cover.

417 U.S. at 752, 754, 94 S.Ct. at 2560, 2560–61, 41 L.Ed.2d at 456. The Court also noted that military personnel were instructed regarding the contents of the Code. *Id.* at 751–52, 94 S.Ct. at 2559, 41 L.Ed.2d at 455. Moreover the Court stressed the "factors differentiating military society from civilian society" and held that the proper standard of review for a vagueness challenge to the articles of the Code is the standard that applies to criminal statutes regulating economic affairs. *Id.* at 756, 94 S.Ct. at 2562, 41 L.Ed.2d at 457.

None of the factors that the *Arnett* and *Parker* opinions mentioned as providing such limitation or guidance are found here. There are no limiting regulations; there is no body of doctrine; there is no office for interpretative guidance; the rule applies to fire department employees rather than military personnel,[1] and no judicial construction of the ordinance and regulation can eliminate their overbreadth and also provide the requisite degree of clarity. *See Smith v. Goguen,* 415 U.S. 566, 580–81, 94 S.Ct. 1242,

1251, 39 L.Ed.2d 605, 616 (1974); *Broadrick v. Oklahoma,* 413 U.S. 601, 617–18, 93 S.Ct. 2908, 2918–19, 37 L.Ed.2d 830, 843–44 (1973); *United States Civil Service Commission v. National Association of Letter Carriers,* 413 U.S. 548, 579–80, 93 S.Ct. 2880, 2897–98, 37 L.Ed.2d 796, 816–17 (1973); *Bence v. Breier,* 501 F.2d 1185, 1188–92 (7th Cir. 1974), *cert. denied,* 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821 (1975); *Waters v. Peterson,* 495 F.2d 91, 99–100 (D.C.Cir. 1973). *See generally* Note, *Constitutional Law—Vagueness Doctrine,* 53 Tex.L.Rev. 1298 (1975). Certainly, the majority opinion has not done so. Therefore the ordinance and regulation are facially overbroad and vague.[2]

This dissent is not an indorsement of insubordination or anarchy in governmental service. Governmental as well as private administrative units must be responsive to management. Policy makers must have the authority to define and accomplish functional goals. Administrators must have the power to direct work and to discipline the idle and the insolent. "[I]t is not feasible or necessary . . . to spell out in detail all that conduct which will result in retaliation." *Arnett v. Kennedy,* 416 U.S. 134, 161, 94 S.Ct. 1633, 1648, 40 L.Ed.2d 15, 37 (1974) (*quoting Meehan v. Macy,* 392 F.2d 822, 835 (D.C.Cir.), *modified on rehearing,* 425 F.2d 469 (1968), *aff'd en banc,* 425 F.2d 472 (1969)). However, certain minimum standards or guidelines are required. *See Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). Management prerogatives can be defined in a manner that makes clear the duties and responsibilities of public employees and yet protects their rights as citizens.[3] In an industrial

1. The military analogy has been rejected with respect to police departments. *Bence v. Breier,* 501 F.2d 1185 (7th Cir. 1974), *cert. denied* 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821 (1975); *Muller v. Conlisk,* 429 F.2d 901, 904 (7th Cir. 1970). Fire departments are also not analogous to the military.

2. We need not pause here to define the differences between these defects. *See, e. g., Coates v. City of Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), distinguishing the first amendment basis of the overbreadth doc-

trine from the due process grounding of the vagueness doctrine.

3. The degree of specificity required of such regulations may depend on the nature of the employees covered. If a large, heterogeneous group of employees is involved, such as in *Arnett,* where most federal employees were subject to the regulations in question, less specificity may be feasible than for a small, homogeneous group of employees such as municipal firefighters. *See generally* Note, *Consti-*

society, suspension and discharge are penalties more severe than those levied for many criminal offenses; they cannot be left to the caprice of a supervisor, particularly when action may be taken, as it was against Davis, for communication protected by the first amendment.[4]

4. We cannot excuse unwillingness to face difficult, even unfamiliar, issues because the Supreme Court has not yet reached them. Certiorari review is reserved principally for conflicts of decision among the circuit courts. Until circuit courts wrestle with a constitutional problem and present in their opinions a full range of precedent and thought appropriate to its resolution, the highest court is not in a position to consider all facets of the problem and reach an informed disposition.