[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

———————————————

No. 19-12747

———————————————

SILVIA COTRISS,

                                        Plaintiff-Appellant,

*versus*

CITY OF ROSWELL,

JAMES RUSSELL GRANT,

Roswell Chief of Police; Individually and in his Official Capacity,

KATHERINE GAINES LOVE,

Roswell City Administrator; Individually and in her Official Capacity,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cv-04589-WMR

_____

Before ROSENBAUM, LAGOA, and ED CARNES, Circuit Judges.

PER CURIAM:

The City of Roswell, Georgia (the "City"), terminated Silvia Cotriss, a former sergeant for the City of Roswell Police Department (the "Police Department"), after a Police Department investigation concluded that Cotriss displayed a Confederate battle flag in front of her private home, sometimes with her police cruiser present. This appeal asks us to determine two separate issues: (1) whether Cotriss satisfactorily pleaded a void-for-vagueness claim under the Fourteenth Amendment; and (2) whether the City's interest in running an efficient and effective Police Department outweighed Cotriss's First Amendment speech interest in flying the flag.

After careful consideration and with the benefit of oral argument, we conclude that Cotriss failed to satisfactorily plead a void-for-vagueness claim under the Fourteenth Amendment. We therefore affirm the district court's order denying Cotriss's request for leave to amend her complaint. And on this record, and as applied to Cotriss, we also affirm the district court's determination that the

City's interest in efficiently and effectively running its Police Department outweighed Cotriss's interest in flying the Confederate battle flag, thereby allowing the City and the Police Department to discipline Cotriss based on her speech.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Cotriss began her law enforcement career for the City in 1996 and was a sergeant with the Police Department at the time of her termination on July 14, 2016.  During Cotriss's employment, Police Department Chief James Russell Grant sought to foster relations with the local African-American community during, what he described as, a time of "tension in race relations between police departments and African-American communities throughout the country."  As part of these efforts, Grant spoke during a service at Eagle's Nest Church to a predominately African-American congregation.

The next day, Christopher Wray, who attended the church service, emailed Grant with a complaint about an officer flying a Confederate battle flag.  Wray's email stated:

> I was in attendance at eagles nest church this past Sunday and actually sat two rows behind you as we discussed race relations and fostering empathy, understanding, and open lines of communication.  I do appreciate your participation and willingness to keep that line of communication open.  I am however disheartened when this Monday morning I am taking my daughter and son to their pre-school to see a

home on west Wiley bridge road flying a confederate flag with a Roswell Police department explorer parked in the driveway. It is very difficult to explain to my daughter that we should trust our police, but in the same sentiment if I were to ever be pulled over or some situation where my family needs the police to protect and serve. My first thought/fear is that it may be the officer proudly flying his/her confederate flag. I fully support our individual rights of free speech and how we express our beliefs as long as there is no harm done to anyone. In light of current race, police, and human relations this officer is representative of the police force tasked to protect and serve.

I hope this email finds you well and this officer will be apart [sic] of your cultural sensitivity and bias removal in the near future.

Wray's July 11, 2016, email prompted an internal investigation that ultimately resulted in Cotriss's termination. Captain Helen Dunkin of the Police Department's Office of Internal Affairs headed the investigation. Early into the investigation, Dunkin determined that the home referenced in the email belonged to Cotriss.

During the investigation, Dunkin interviewed Cotriss twice, first in person on July 12, 2016, and then telephonically on July 13, 2016. Over the course of these interviews, it was revealed that Cotriss had been on medical leave from the Police Department as of March 15, 2016, and that she was not in possession of her police

cruiser on the date of Wray's email, as she had returned it to the Police Department months earlier for radio reprogramming. The police cruiser was therefore not parked outside her home. During the interviews, Cotriss stated that she had lived at her current address for about eleven years, that her neighbors were aware of her position at the Police Department, and that she parked her police cruiser in her driveway prior to surrendering it for reprogramming.

Cotriss admitted to Dunkin that there had been two Confederate-like battle flags separately displayed on a flagpole underneath an American flag at her home since about April or May 2015. So at least prior to Wray's email, a version of the Confederate battle flag had flown at Cotriss's home at points when Cotriss's police cruiser was visibly present. Cotriss explained that the first flag was purchased by her late-husband and resembled a Confederate battle flag with a motorcycle emblem in the center—a flag representing a group of motorcyclists who participate in "Bike Week." Then, in June 2016, when this first flag became worn, Cotriss's roommate removed it and, with Cotriss's permission, replaced it with a new Confederate battle flag that the roommate received from a neighbor. Cotriss explained she viewed the flags as a way to honor her "Southern heritage" and her late husband.

Cotriss offered to remove the flag after her initial interview with Dunkin, and between the first and second interviews, Cotriss, in fact, removed the flag. Then, after the second interview, Dunkin prepared a written report, charging Cotriss with engaging in conduct while off duty that was unbecoming and that resulted in

6                    Opinion of the Court                    19-12747

discrediting the Police Department. Per the report, Cotriss violated Police Department Policies 16.5 and 16.82 and City Personnel Policy 13.1(9). The applicable policies, in relevant part, state:

> 16.5 Duty Regarding Conduct
>
> Police Officers having a position of trust and civic responsibility should so conduct themselves as to merit the confidence and respect of the public and fellow officers.
>
> 16.82 Conduct Unbecoming On/Off Duty
>
> Engaging in conduct on or off duty which adversely affects the efficiency of the Department, and has a tendency to destroy the public respect for the employee or the Department, or destroys confidence in the operation of the City service is conduct unbecoming and is prohibited.
>
> 13.1 Violations
>
> (9) Any conduct, on or off-duty, that reflects unfavorably on the City as an employer.

In concluding her report, Dunkin recommended that the charge against Cotriss be "sustained." Dunkin then transmitted the report to Grant, who sustained the charge. Then, on July 14, 2016, Grant terminated Cotriss's employment with the Police Department. According to Grant's deposition testimony, Grant believed that termination of employment, instead of a lesser penalty like bias training, was merited for the following reasons: (1) Grant believed that displaying the Confederate battle flag suggested poor

judgment on the part of Cotriss; (2) Grant believed that Cotriss had not been fully forthcoming during the investigation; and (3) Cotriss had a prior disciplinary action on her record—a three-day suspension without pay.

Cotriss appealed her termination to the City's Human Resources Department, which affirmed Grant's decision to terminate Cotriss. In his response letter to Cotriss, Human Resources Director Jim Harner stated to Cotriss that:

> Flying a Confederate flag prominently in front of your home, while also having your marked police vehicle visible to passersby, has a tendency to destroy public confidence in, and respect for, the Roswell Police Department and your position as a law enforcement officer serving all Roswell citizens.

Harner also noted that, after Cotriss's prior three-day suspension, Cotriss had been "notified in writing that any further performance or policy violations may result in disciplinary action up to and including termination."

Cotriss then appealed to City Administrator Katherine Love, stating that she was "concerned that we (police officers) are expected to abide by an unwritten code determined by current events" pertaining to the Confederate battle flag. In her letter requesting reversal of her termination, Cotriss noted that the City "has a lot of Confederate history," providing as an example that visitors to the "Smith House pay a fee to learn about the Confederate history of Roswell." Cotriss also noted that the "State of

8                         Opinion of the Court                    19-12747

Georgia still takes pride in the Confederate flag by selling the Georgia license plate displaying the flag." Thus, Cotriss's letter claimed, the flag "is not considered offensive by very many people."[1]

After receiving Cotriss's letter of appeal, Love upheld Cotriss's termination. Love stated that Cotriss's appeal "d[id] not have merit." Love further explained to Cotriss that:

> [Y]ou have demonstrated unacceptable and poor judgment in flying a Confederate flag at your residence while at the same time having a marked City of Roswell police vehicle at your residence. Holding any position in law enforcement requires acute situational awareness and the supervisory rank of Sergeant requires that one demonstrate behavior to those whom you supervise and to the public that promotes and upholds public confidence, credibility, and respect in law enforcement.

After exhausting these administrative appeals, Cotriss filed suit under 42 U.S.C. § 1983 against the City, as well as against Grant and Love, in both their individual and official capacities.[2] Cotriss's complaint alleged a single claim—violation of her First Amendment free speech right for being terminated because of the

---

[1] At the time of Cotriss's termination, the State of Georgia also flew the Confederate battle flag and other flags of the Confederate States of America at Stone Mountain Park.

[2] The City, Grant, and Love are referred to as the "Defendants" when discussed collectively.

Confederate battle flag that she displayed at her home. In response, Defendants moved to dismiss her claim for failing to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). In an order not on appeal before this panel, the district court granted in part the motion as to Cotriss's free speech retaliation claim against Grant and Love in their individual capacities on qualified immunity grounds. The district court denied the motion against the City, as well as Grant and Love in their official capacities, and the case proceeded to the summary judgment stage.

After Cotriss retained new counsel, she moved for leave to amend her complaint to add two counts under the First, Fifth, and Fourteenth Amendments, alleging that Defendants' "disciplinary policies were unconstitutional as applied to Sgt. Cotriss because they did not provide fair notice that her speech was prohibited." The district court denied the motion, concluding that the proposed claims were futile.

Following discovery on the free speech retaliation claim, Cotriss and Defendants cross-moved for summary judgment. After a hearing on the motions, the district court denied Cotriss's motion, granted Defendants' motion, and entered judgment for Defendants. The district court found that, although Cotriss's display of the Confederate battle flag constituted speech made as a citizen related to a matter of public concern, the City's interest in operating an effective Police Department outweighed Cotriss's interest in her speech, thereby allowing the City and the Police Department to discipline Cotriss. This is because the district court held that

Cotriss failed to "identif[y] a coherent interest in her speech," as she provided "only vague references to 'Southern heritage' and 'riding motorcycles'" in support of her speech, while Defendants provided the rationale that a police officer flying a flag "associated with racism" would diminish the Police Department's standing with members of the community.  This timely appeal ensued.

## II.    STANDARD OF REVIEW

Generally, we review the appeal of a district court's denial of a motion for leave to amend for abuse of discretion.  *SFM Holdings, Ltd. v. Banc of Am. Sec., LLC*, 600 F.3d 1334, 1336 (11th Cir. 2010).  But where, as here, the district court determined whether an amendment would be futile, our review is *de novo*.  *Id.*

We review a district court's grant of summary judgment *de novo*, construing the record evidence in the light most favorable to the nonmoving party and resolving all reasonable doubts about the facts in favor of the nonmoving party.  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012).  "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law."  *Id.*  "In other words, '[t]he District Court [must] consider all evidence in the record when reviewing a motion for summary judgment— pleadings, depositions, interrogatories, affidavits, etc.—and can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'"  *Id.* (alterations in original) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir.1986)).

19-12747                Opinion of the Court                11

### III.    ANALYSIS

On appeal, Cotriss argues that the district court erred in: (1) denying her motion for leave to amend her complaint because her additional claims were futile; and (2) granting summary judgment for Defendants because the City's interest in efficient policing outweighed Cotriss's speech interest. We address each argument in turn.

### A.    Leave to Amend the Complaint

Under Federal Rule of Civil Procedure 15(a)(2), leave to amend a complaint should be freely given so long as the amendment would not be futile. *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1262–63 (11th Cir. 2004). An amendment is futile when the proposed additions would be subject to dismissal under the Rule 12(b)(6) standard for failure to state a claim upon which relief can be granted. *See id.* at 1263. As applicable to a Rule 12(b)(6) motion to dismiss, Federal Rule of Civil Procedure 8(a)(2) requires a complaint to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." "When evaluating a motion to dismiss," we "assume the veracity of well-pleaded factual allegations and 'then determine whether they plausibly give rise to an entitlement to relief.'" *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934–35 (11th Cir. 2022) (quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)).

Cotriss appeals the district court's denial of her motion to amend her initial complaint. In her proposed amended complaint,

Cotriss added two additional counts to her original free speech retaliation count.  Under both new counts, Cotriss alleged that:

> Because the Department and Roswell policies under which Defendants terminated Sgt. Cotriss did not provide her fair notice that displaying a Confederate flag on a flagpole at her residence would result in her termination, such policies are unconstitutionally vague as applied to Sgt. Cotriss.

Under Count 1 for "Failure to Provide Fair Notice of Prohibited Speech in Violation of the First Amendment," Cotriss claimed that the policies violated the First and Fourteenth Amendments because they were "unconstitutionally vague" and "did not provide [her] fair notice that her speech was prohibited."  Under Count 2 for "Failure to Provide Fair Notice of Prohibited Speech in Violation of the Due Process Clause of the Fifth and Fourteenth Amendments," Cotriss similarly claimed that the policies violated her "right to due process under the Fifth and Fourteenth Amendments" because they were "unconstitutionally vague" and "did not provide [her] fair notice that her speech was prohibited."  And the third count in her proposed amended complaint is duplicative of Cotriss's free speech retaliation claim in her original complaint.

The district court found that Cotriss's proposed amended complaint "would not withstand a motion to dismiss" because "it is futile."  In coming to this determination, the district court made several relevant conclusions.  First, the district court determined that Cotriss's new "[c]hallenges to the vagueness of a government

policy are due process claims." Second, the district court found that the Due Process Clause of the Fourteenth Amendment—not the Fifth Amendment—governed Cotriss's claims because the Fourteenth Amendment applies to the States. Third, the district court noted that Cotriss "d[id] not explain" whether she alleged "a violation of procedural or substantive due process" under the Fourteenth Amendment but concluded that her claims failed under either theory. Fourth, in conducting its due process analysis, the district court noted that Cotriss did not contend that she had a property interest in her continued employment with the Police Department. Fifth, regarding substantive due process, the district court determined that "Cotriss cannot present a First Amendment argument as a substantive due process violation where she allege[d] a First Amendment violation on the same set of facts" as her free speech retaliation claim.

On appeal, Cotriss argues that her proposed amended complaint "did not seek to assert her free speech retaliation claim as a substantive due process claim." She asserts that her "fair notice claims and her free speech retaliation claim are district [sic] and independent claims that arise from different facts." She contends that her "fair notice claims arise from the City's application of vague conduct unbecoming policies to restrict speech that is not clearly prohibited under such policies," whereas "her free speech retaliation claim arises from the City's termination of her employment due to her protected speech." Thus, Cotriss frames her "fair notice claims," which she pleaded under the First, Fifth, and Fourteenth

Amendments, on the idea that the Police Department and City policies at issue are "vague," in that she did not know that flying a Confederate battle flag could result in her termination.

As a preliminary matter, the district court correctly determined that Cotriss's Fifth Amendment due process claim failed because the Fifth Amendment applies only to the federal government, not to the States. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002). Likewise, the district court correctly concluded that the allegations in both Counts 1 and 2 of the proposed amended complaint relate to the void-for-vagueness doctrine under the Fourteenth Amendment. The doctrine, while often employed in relation to criminal statutes, *see, e.g.*, *United States v. Williams*, 553 U.S. 285, 288 (2008), has also been applied in the public employment context, *see, e.g.*, *Arnett v. Kennedy*, 416 U.S. 134, 159–60 (1974) (plurality opinion).

The void-for-vagueness doctrine is grounded in the Due Process Clauses of the Fifth and Fourteenth Amendments, not in the First Amendment.[3] *See Williams*, 553 U.S. at 304 ("Vagueness

---

[3] Cotriss did not bring a separate overbreadth claim under the First Amendment. The overbreadth doctrine pertains to the illegitimate prohibition of "a substantial amount of protected speech." *Williams*, 553 U.S. at 292. As explained by the former Fifth Circuit, conduct unbecoming "catch-all provisions" are "often attacked on vagueness (due process) and overbreadth (first amendment) grounds." *Davis v. Williams*, 617 F.2d 1100, 1103 (5th Cir. 1980); *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981). As a result of Cotriss's

19-12747                 Opinion of the Court                 15

doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment."); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("Th[e] requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."); *Davis v. Williams*, 617 F.2d 1100, 1102–04 (5th Cir. 1980) (analyzing void-for-vagueness doctrine in the Fourteenth Amendment context). Though, in some instances, due process concerns about vagueness can be magnified if First Amendment expression is involved. *See, e.g.*, *Smith v. Goguen*, 415 U.S. 566, 573 (1974) ("Where a [criminal] statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [void-for-vagueness] doctrine demands a greater degree of specificity than in other contexts.").

"The root of the vagueness doctrine is a rough idea of fairness" in that a person must have "fair warning" or fair notice of prohibited conduct. *Colten v. Kentucky*, 407 U.S. 104, 110 (1972). Therefore, a governmental employment policy or regulation "which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at

---

failure to bring a separate First Amendment overbreadth claim, we are not presented with a justiciable opportunity to review the policies at issue for overbreadth, and we express no view on the issue. *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 20 (2010) (noting that the void-for-vagueness doctrine is distinct from the overbreadth doctrine and that they are not "substantially redundant").

its meaning and differ as to its application violates the first essential of due process of law." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926); *see also Davis*, 617 F.2d 1100 (applying void-for-vagueness doctrine in case centering on municipal fire department rules, regulations, and ordinances).  Indeed, the void-for-vagueness doctrine encapsulates the ideas that "regulated parties should know what is required of them so they may act accordingly" and that "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox*, 567 U.S. at 253.

Since the void-for-vagueness doctrine applicable to this case is rooted in Fourteenth Amendment due process, Cotriss must first satisfy the elements of bringing a due process claim, which she failed to do here.  The Due Process Clause of the Fourteenth Amendment states that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.  "The Supreme Court's interpretation of this clause explicates that the amendment provides two different kinds of constitutional protection: procedural due process and substantive due process." *McKinney v. Pate*, 20 F.3d 1550, 1555 (11th Cir. 1994) (en banc).  "The substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'"  *Id.* at 1556 (quoting *Palko v. Connecticut*, 302 U.S. 319, 325 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 794 (1969)).  "Because employment rights are state-created rights and

are not 'fundamental' rights created by the Constitution, they do not enjoy substantive due process protection." *Id.* at 1560.  State-created employment rights can, however, be protected by procedural due process requirements. *Id.*

"The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 569 (1972).  In most cases, "[w]hen protected interests are implicated, the right to some kind of prior hearing is paramount" before a governmental entity may deprive one of that interest.  *Id.* at 569–70 & n.7.  A governmental entity "may cure a procedural deprivation by providing a later procedural remedy; only when the [entity] refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation actionable under section 1983 arise." *McKinney*, 20 F.3d at 1557.

"A public employee," like Cotriss, "has a property interest in employment if 'existing rules or understandings that stem from an independent source such as state law create a legitimate claim of entitlement.'" *Ross v. Clayton County*, 173 F.3d 1305, 1307 (11th Cir. 1999) (quoting *Roth*, 408 U.S. at 577–78).  Cotriss's proposed amended complaint, however, made no reference to having a property interest in her job.  And throughout subsequent briefing, including briefing before this Court, Cotriss conceded that she did not have a property interest in her job.  As a result, we will not

consider a property interest theory underpinning Cotriss's void-for-vagueness procedural due process claim.

In public employment cases, a public employee can also have a liberty interest in continued employment. *See, e.g.*, *Warren v. Crawford*, 927 F.2d 559, 565 (11th Cir. 1991). A public employee's liberty interest generally centers on her interest in being free from reputational harm, stigma, or the foreclosure of future employment opportunities by government actions, without being given an opportunity for a hearing or redress. *See Roth*, 408 U.S. at 573–75; *Arnett*, 416 U.S. at 156–58. Indeed, this Court has held that "[t]o establish a deprivation of a liberty interest without due process of law," a public employee, like Cotriss, must show: "(1) a false statement (2) of a stigmatizing nature (3) attending a governmental employee's discharge (4) made public (5) by the governmental employer (6) without a meaningful opportunity for [an] employee name clearing hearing." *Warren*, 927 F.2d at 565 (second alteration in original) (quoting *Buxton v. City of Plant City*, 871 F.2d 1037, 1042–43 (11th Cir. 1989)).

Despite using the term "liberty interest" in her relevant briefings, Cotriss conceded to the district court that she "does not allege that she was denied a hearing to which she was legally entitled" and that she "does not allege a due process violation for the City's failure to allow her a name clearing hearing." Thus, Cotriss does not challenge the procedural adequacy of the Police Department's investigation of her conduct or the adequacy of the process available to her to appeal her termination to the Human Resources

Department and the City Administrator. And, therefore, Cotriss failed to sufficiently plead a procedural due process claim under a liberty interest theory in her proposed amended complaint.

In Cotriss's reply in support of her motion for leave to amend the complaint, Cotriss stated that "it goes without saying (which is why it was not said) that freedom of speech is a fundamental liberty interest." Cotriss makes similar statements about having a liberty interest in her speech in her briefing before this Court. Like the district court, we view these statements as an attempt to assert a substantive due process claim because the "substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty.'" *McKinney*, 20 F.3d at 1556 (quoting *Palko*, 302 U.S. at 325); *cf. Perry v. Sindermann*, 408 U.S. 593, 599 n.5 (1972) (rejecting argument that "the respondent might have a due process right to some kind of hearing simply if he asserts to college officials that their decision was based on his constitutionally protected conduct").

Unlike procedural due process protection, a "finding that a right merits substantive due process protection means that the right is protected 'against "certain government actions regardless of the fairness of the procedures used to implement them."'" *McKinney*, 20 F.3d at 1556 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). But the Supreme Court has instructed that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort

of government behavior, that Amendment, not the more general-
ized notion of substantive due process, must be the guide for ana-
lyzing these claims." *County of Sacramento v. Lewis*, 523 U.S. 833,
842 (1998) (alteration in original) (quoting *Albright v. Oliver*, 510
U.S. 266, 273 (1994) (plurality opinion)); *accord Echols v. Lawton*,
913 F.3d 1313, 1326 (11th Cir. 2019).  Thus, the proper vehicle for
Cotriss to have alleged a First Amendment deprivation is the First
Amendment itself under a free speech retaliation theory, which Co-
triss did allege, or another First Amendment theory, such as over-
breadth, which Cotriss did not allege.

Ultimately, the allegations underpinning the additional
counts in Cotriss's proposed amended complaint constitute void-
for-vagueness claims, in that Cotriss alleged that she did not have
fair notice of prohibited conduct from vague policies.  Cotriss failed
to sufficiently plead the requisites for such claims under the Due
Process Clause of the Fourteenth Amendment.  For the above rea-
sons, the district court correctly determined that Cotriss's pro-
posed amended complaint "would not withstand a motion to dis-
miss."

## B.    Summary Judgment

Cotriss next argues that the district court erred in granting
summary judgment for Defendants on her free speech retaliation
claim.  She believes that Defendants' decision to terminate her em-
ployment with the Police Department constituted unlawful retali-
ation in violation of her First Amendment right to free speech.  Co-
triss takes particular issue with the district court's application of the

analytical framework that a plaintiff must satisfy to establish a First Amendment claim under § 1983, as set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny, *see, e.g., Bryson v. Waycross*, 888 F.2d 1562 (11th Cir. 1989).

"Although the law is well-established that the state may not demote or discharge a public employee in retaliation for speech protected under the first amendment, a public employee's right to freedom of speech is not absolute." *Bryson*, 888 F.2d at 1565. As a threshold matter, "[t]o qualify as constitutionally protected speech in the First Amendment[] government employment retaliation context," that merits application of the *Pickering* analysis, "the speech must be made by a government employee speaking as a citizen and be on a subject of public concern." *Boyce v. Andrew*, 510 F.3d 1333, 1342–43 (11th Cir. 2007) (per curiam) (emphasis omitted). This is because the "Constitution does not insulate" a government employee's "communications from employer discipline" when a government employee makes "statements pursuant to [her] official duties." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006); *accord Boyce*, 510 F.3d at 1342.

Here, the district court held that Cotriss spoke as a citizen because there was "no indication that [Cotriss's] speech was in any way connected to her responsibilities as a Sergeant for the Roswell Police Department." On appeal, the parties do not dispute that Cotriss spoke as a citizen. With this in mind, and given that the inquiry into the nature of Cotriss's speech is a "practical" one, *see Garcetti*, 547 U.S. at 424, we agree with the district court that

Cotriss's raising of the Confederate battle flag on her private property constituted speech made by a government employee acting as a citizen.

Moving to the framework explained in *Pickering* and cases applying it, to establish her free speech retaliation claim, Cotriss must show that: (1) her speech, as construed through the display of the Confederate battle flag, involved a matter of public concern; (2) her interest in the speech outweighed the City's legitimate interest in the effective and efficient fulfillment of Police Department responsibilities and operations; and (3) her speech played a substantial part in the City's decision to terminate her. *See Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1318 (11th Cir. 2005). If Cotriss can make the above showings, the burden shifts to Defendants to show that, by a preponderance of evidence, Defendants would have made the same employment decision even in the absence of the protected speech. *Id.* The first two prongs of this analysis are questions of law, while the latter two are questions of fact. *Id.*

As to the first prong of the analysis, the district court held that Cotriss's display of the Confederate battle flag at her home constituted speech concerning a matter of public concern. On appeal, the parties do not challenge this finding. We have not yet addressed whether the Confederate battle flag constitutes a matter of public concern under a *Pickering* analysis. And we need not make such a determination today because, even assuming the flag does constitute a matter of public concern, Cotriss's claim must fail under the second prong of the analysis as a matter of law.

As to the fatal second prong, the district court found that the City's interest in effective and efficient fulfilment of its Police Department operations outweighed Cotriss's speech interest. In determining whether the City's interest in providing efficient government services outweighed Cotriss's speech interest, we consider various factors including: "(1) whether the speech at issue impedes the government's ability to perform its duties efficiently, (2) the manner, time and place of the speech, and (3) the context within which the speech was made." *Martinez v. City of Opa-Locka*, 971 F.2d 708, 712 (11th Cir. 1992) (per curiam) (emphasis omitted) (quoting *Bryson*, 888 F.2d at 1567). In the context of public employment, this balancing of interests gives latitude to employers to discipline employees whose speech "may unreasonably disrupt the efficient conduct of government operations." *Tindal v. Montgomery Cnty. Comm'n*, 32 F.3d 1535, 1540 (11th Cir. 1994). "[Q]uasi-military organizations such as police departments" have particularly "special concerns" when it comes to the efficiency and effectiveness of their operations. *Hansen v. Soldenwagner*, 19 F.3d 573, 577 (11th Cir. 1994). "Indeed, we have recognized a heightened need for order, loyalty, and harmony in a quasi-military organization such as a police or fire department." *Moss v. City of Pembroke Pines*, 782 F.3d 613, 621 (11th Cir. 2015). Ultimately, public employers need not provide proof of actual disruption to their duties and operations; rather, they must show that the speech has the reasonable possibility of causing harm. *Moss*, 782 F.3d at 622.

Here, on this particular record, the district court properly found that the balance of interests weighed in favor of Defendants. As noted by this Court, to some, the Confederate battle flag "'is said to evoke the memory of their ancestors and other soldiers who fought for the South in the Civil War.' But to many others, 'it symbolizes slavery, segregation, and hatred.'" *Leake v. Drinkard*, 14 F.4th 1242, 1252–53 (11th Cir. 2021) (citation omitted) (quoting *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 234 (2015) (Alito, J., dissenting)), *cert. denied*, 142 S. Ct. 1443 (2022). The City, then and now, has a clear interest in maintaining a favorable reputation with the public and in ensuring there are no disruptions within the Police Department. *See, e.g.*, *McMullen v. Carson*, 754 F.2d 936, 939 (11th Cir. 1985) ("Efficient law enforcement requires [the public's] mutual respect, trust, and support." ); *Moss*, 782 F.3d at 621–22 (affirming the district court's determination that "the City's interest in avoiding dissension and discord in the fire department . . . outweighed Plaintiff's" free speech interests). These interests could be impeded if members of the public, who have valid concerns about the symbolism of the Confederate battle flag, associate the Police Department with the flag. *Cf. McMullen*, 754 F.2d at 940 (taking into consideration an "understandably adverse public reaction" that would "seriously and dangerously threaten[] to cripple the ability of the law enforcement agency to perform effectively its public duties"). That was likely given that Cotriss had on some occasions flown the flag while a City police cruiser was parked in her yard. And, in this case, Defendants pointed to an actual complaint from a citizen about the

flag's display at Cotriss's home and the flag's perceived association with the Police Department, which, in turn, affected that person's trust in the effectiveness of the City's police force.

Although the return of Cotriss's police cruiser to the Police Department weakened the association between the flag and the Police Department, and Cotriss's eventual removal of the flag eliminated any such association, the damage was done: the flag had been visible to the public for over a year before it was removed. And at least one resident observed and associated the Police Department with the flag to the point that the person complained about the flag to the Police Department. Thus, the district court correctly concluded that, on balance and on this record, Cotriss's speech could impede the Police Department's ability to perform its public duties.

The remaining factors—the manner, time, place, and context of the speech—likewise weigh in favor of Defendants. As discussed above, the use of the Confederate battle flag could offend many members of the public and affect their trust in the Police Department. *See Scott v. School Bd. of Alachua Cnty.*, 324 F.3d 1246, 1248 (11th Cir. 2003) (acknowledging that "even if the symbol is not intended to be offensive or innately offensive, it is still dangerous because it is perceived as offensive by so many people"). Cotriss displayed the flag prominently in front of her home atop a flagpole for over a year with her marked police cruiser nearby on occasion, creating, at the very least, an implicit connection between the flag and the Police Department. Although Cotriss displayed

the flag under an American flag—similar to the display seen at Stone Mountain Park—and Cotriss did not claim to fly the flag out of racial animus, the district court correctly concluded that the City's interest in effective and efficient fulfilment of its Police Department operations outweighed Cotriss's speech interest in displaying a Confederate battle flag, which she can still fly today as a private citizen.  The district court therefore did not err in granting summary judgment to Defendants on Cotriss's First Amendment free speech retaliation claim.

## IV.    CONCLUSION

For the reasons stated, we affirm the district court's denial of Cotriss's motion to amend her complaint.  We also affirm the district court's grant of summary judgment for Defendants on Cotriss's free speech retaliation claim.

**AFFIRMED.**